[No. G041339. Fourth Dist., Div. Three. Aug. 26, 2009.]

CLAUDIO PARADA et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
MONEX DEPOSIT COMPANY et al., Real Parties in Interest.

1556

**COUNSEL**

Law Offices of Steve A. Buchwalter, Steve Buchwalter; and Sheldon Jaffe for Petitioners.

Aidikoff, Uhl & Bakhtiari, Robert A. Uhl; and William A. Jacobson for Cornell Securities Law Clinic as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Pistone & Wolder, Thomas A. Pistone, Mitchell S. Riechmann, Aaron C. Watts; Farella Braun & Martel, Neil A. Goteiner and Frank J. Riebli for Real Parties in Interest.

OPINION

FYBEL, J.—

### INTRODUCTION

Plaintiffs and petitioners Claudio Parada and Elizabeth Garcia Parada (the Paradas), Fernando Perez and Jeanette Perez (the Perezes), and Sergio Navarrete (collectively, Petitioners) seek a writ of mandate to overturn the order compelling them to arbitrate their claims against defendants and real parties in interest Monex Deposit Company, Monex Credit Corporation (collectively, Monex), and Terry Parsons. We grant the petition and order the issuance of a writ of mandate.

Petitioners invested substantial sums of money through Monex, which deals in precious metals. When making their initial investments, Petitioners signed form agreements (referred to as Atlas Account Agreements) requiring any disputes with Monex to be arbitrated before a panel of three arbitrators from the Judicial Arbitration and Mediation Service (JAMS) and prohibiting consolidation or joinder of claims. At that time, the Paradas were school teachers, Fernando Perez worked as a driver for Federal Express, and Navarrete was a school custodian. Petitioners lost their entire investments with Monex. They sued Monex and Parsons for causes of action including constructive fraud, commodities fraud, and violation of the California unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.).

We hold the paragraphs in the Atlas Account Agreements requiring arbitration before a panel of three arbitrators from JAMS and prohibiting consolidation or joinder of claims are unconscionable and therefore unenforceable. Because those unconscionable paragraphs cannot be severed from the rest of the arbitration provisions, Petitioners cannot be compelled to arbitrate their claims against Monex and Parsons.

### FACTS

### I.

### *The Atlas Account Agreements*

Monex is a precious metals dealer. According to Monex, "[i]t offers broadly two types of services: (i) customers can purchase precious metals for cash delivery; or (ii) they can buy commodities for cash storage, buy commodities on credit, or borrow commodities through so-called 'Atlas Accounts.' " Monex does not require investors to sign account agreements for cash transactions. For credit transactions, Monex requires investors to open an Atlas account and sign a Monex Atlas account agreement.

An Atlas account agreement consists of a purchase and sale agreement and a loan, security and storage agreement. Both agreements include identical 11-paragraph arbitration provisions. The first paragraph of the arbitration provisions states: "The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between them or to the breach, termination, enforcement, interpretation or validity of this Agreement, including the determination of the scope or applicability of this agreement to arbitrate, shall be submitted to final and binding arbitration before JAMS, or its successor, in Orange County, California, in accordance with the laws of the State of California for agreements made in and to be performed in California (including, without limitation, the California Arbitration Act)."

Paragraph 15.11, subparagraph e of the purchase and sale agreement and paragraph 31.5 of the loan, security and storage agreement state: "The parties agree that the arbitration shall be heard by and determined by a panel of three (3) arbitrators. Nominations shall take place within thirty (30) days of the date that the dispute or controversy is at issue, that is, the day upon which all parties to the dispute or controversy have answered all claims and cross-claims. The parties will each select an arbitrator from JAMS list of arbitrators in Orange County, California. The selected arbitrators shall then select a third arbitrator from that list who shall act as Chairperson of the panel. The Chairperson shall be a retired judge of either the California Superior Court or any United States District Court in California." We refer to these paragraphs as the Arbitration Panel paragraphs.

Paragraph 15.11, subparagraph h of the purchase and sale agreement and paragraph 31.8 of the loan, security and storage agreement state: "Disputes and controversies between the parties to this Agreement shall not be joined or consolidated with the disputes or controversies of any person not a party to this Agreement. No party may attempt to assert claims on behalf of a class or group of persons." We refer to these paragraphs as the No Consolidation paragraphs.

The arbitration provisions state, "the arbitration shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration Rules and Procedures in effect at the time of filing the demand for arbitration." A copy of those JAMS rules and procedures are not attached to the Atlas Account Agreements. The JAMS rules and procedures require the parties to deposit the fees and expenses for arbitration before the hearing, and provide that if a party fails to deposit his or her pro rata or agreed-upon share of fees and expenses, the arbitrator may preclude that party from presenting evidence of an affirmative claim at the hearing.

Paragraph 15.11, subparagraph i of the purchase and sale agreement and paragraph 31.9 of the loan, security and storage agreement state: "The parties agree that they will share equally in the arbitration costs, subject to the arbitrators' discretion to allocate the costs of the arbitration, including the fees of the arbitrators and the parties['] reasonable attorney's fees, between the parties in any proportion."

Paragraph 16, subparagraph *l* of the purchase and sale agreement and paragraph 36, subparagraph m of the loan, security and storage agreement state: "I affirm that I have read and understand the foregoing and agree to submission of all disputes, claims or controversies arising out of or relating to my transactions with MDC [Monex] or to this Agreement to neutral arbitration in accordance with the provisions of this Agreement."

## II.

### *Petitioners Invest Through Monex*

Each petitioner opened an Atlas account with Monex in 2006. The Paradas were school teachers with a combined annual income of about $66,000 in September 2008.[1] They opened their Monex Atlas account on February 13, 2006, with an initial investment of $4,000 and ultimately invested over $140,000 through Monex.

When the Paradas opened their Monex Atlas account, a Monex representative (defendant and real party in interest Parsons), presented them with the purchase and sale agreement and the loan, security and storage agreement. Parsons told the Paradas, "they did not need to sign the Atlas Account Agreements if they intended on purchasing the precious metals for personal delivery." (Boldface omitted.) Parsons also explained the risks involved in investing in precious metals. Parsons told the Paradas, "they could take the Atlas Account Agreements home and review them and then call [him] with any questions before opening an account." The Paradas signed the Atlas Account Agreements at that time, and their account was opened. The Paradas alleged they purchased almost $2.5 million in metals on credit, and lost at least $113,000 in "out of pocket losses" from their Monex Atlas account.

Fernando Perez was a driver for Federal Express. He and his wife, Jeanette Perez, had a combined annual income of about $70,000 in September 2008. The Perezes opened a Monex Atlas account in March 2006 with a $30,000

---

[1] In opposition to the motion to compel arbitration, Elizabeth Parada, Fernando Perez, and Navarrete submitted declarations signed in September 2008 setting forth their respective family incomes, expenses, assets, and debts at that time.

check and ultimately invested a total of $43,000. They lost about $44,000 from their Monex Atlas account.

Fernando Perez first contacted Parsons about investing in precious metals through Monex in February 2006. Parsons agreed to mail Perez the purchase and sale agreement and the loan, security and storage agreement and told Perez he "did not need to sign the Atlas Account Agreements if he intended on purchasing the precious metals for personal delivery." (Boldface omitted.) The Perezes signed the Atlas Account Agreements on March 23, 2006. On March 24, 2006, Monex received signed Atlas Account Agreements from the Perezes, and, on March 29, a Monex representative signed those Atlas Account Agreements. On March 27, Parsons spoke with Fernando Perez, explained the "risks of doing business with . . . Monex," and asked him if he agreed to be bound by the Atlas Account Agreements. Fernando Perez "responded affirmatively." The Perezes made their first Atlas account purchase on March 27, 2006. Fernando Perez signed and submitted additional sets of Atlas Account Agreements on March 29 and May 16, 2006.

Navarrete opened a Monex Atlas account in April 2006. At that time, he worked as a custodian at an elementary school and had an annual salary of $55,000. On February 24, 2006, Navarrete telephoned Parsons and expressed interest in purchasing precious metals. Parsons explained the risks of investing in precious metals and investing through Monex. Parsons told Navarrete that "if he wished to finance purchases of precious metals and/or store them through Monex, he would have to review and sign the Atlas Account Agreements," but "he did not need to sign the Atlas Account Agreements if he intended on purchasing the precious metals for personal delivery" (boldface omitted). After the telephone conversation, Parsons had the Atlas Account Agreements mailed to Navarrete.

Parsons spoke by telephone with Navarrete on March 16, 2006, and further discussed investing in precious metals. Parsons met in person with Navarrete on April 11 and provided him oral disclosures of "various terms and risks associated with Atlas Account transactions." Parsons offered Navarrete another copy of the Atlas Account Agreements, and Navarrete "indicated" he had already reviewed the Atlas Account Agreements mailed to him. Parsons did not explain or discuss any of the terms of the Atlas Account Agreements.

On April 11, 2006, Navarrete made his first Monex Atlas account purchase. Navarrete signed the Atlas Account Agreements on April 14, 2006, and a Monex representative signed them on April 18.

Navarrete initially invested $30,000 through Monex. About three months after the initial investment, he followed Parsons's recommendation by obtaining a loan, secured by his home, for $100,000 and investing the loan proceeds through Monex. Navarrete lost "in excess of $123,000 or $130,000" in his Monex Atlas account.

## PROCEEDINGS IN THE TRIAL COURT

In the complaint, filed in June 2008, Petitioners sought damages from Monex and Parsons for losses arising out of their Monex Atlas account investments. The complaint alleged causes of action against Monex and Parsons for fraudulent misrepresentation, deceit, constructive fraud, commodities fraud, breach of fiduciary duty, negligent misrepresentation, negligence, and unfair competition under the UCL.[2]

Monex moved to compel arbitration based on the arbitration provisions of the Atlas Account Agreements. Petitioners opposed the motion, arguing, among other things, the requirement of a three-judge panel was substantively unconscionable because that requirement made arbitration so costly as to make it "difficult or impossible to vindicate a claim."

The trial court granted the motion to compel arbitration. Petitioners filed a petition for writ of mandate with this court. We issued an order to show cause, real parties in interest Monex and Parsons filed a return, Petitioners filed a reply, and the case was orally argued before us.

## DISCUSSION

## I.

### *The Court Decides the Issue of Unconscionability in This Case.*

 As a threshold matter, we must decide who—the trial court or the arbitration panel—determines whether the arbitration provisions in the Atlas Account Agreements are unconscionable. Monex argues the parties agreed the arbitration panel, not the court, must decide that issue. Petitioners argue unconscionability must always be decided by the court, notwithstanding the parties' agreement otherwise. If the party resisting arbitration is claiming the arbitration clause is unconscionable, a court must decide this claim. (*Discover*

---

[2] All of these claims are arbitrable. (See *Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 320 [133 Cal.Rptr.2d 58, 66 P.3d 1157] [claims for restitution or disgorgement under the UCL are arbitrable].)

*Bank v. Superior Court* (2005) 36 Cal.4th 148, 171 [30 Cal.Rptr.3d 76, 113 P.3d 1100].) It has been held the parties can agree otherwise (*Murphy v. Check 'N Go of California, Inc.* (2007) 156 Cal.App.4th 138, 144 [67 Cal.Rptr.3d 120]) on the basis that "[b]ecause the parties are the masters of their collective fate, they can agree to arbitrate almost any dispute—even a dispute over whether the underlying dispute is subject to arbitration" (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1286 [73 Cal.Rptr.3d 395]). We withhold our opinion whether we agree with our colleagues in *Murphy v. Check 'N Go of California, Inc., supra,* 156 Cal.App.4th 138, and *Bruni v. Didion, supra,* 160 Cal.App.4th 1272. To permit the arbitrator to decide the issue of arbitrability, even if the contract so provides, raises issues we need not reach in this case. One such issue that particularly concerns us is whether having the arbitrator decide the issue of arbitrability presents the arbitrator with a conflict of interest.

■ We do not reach the question whether parties to a contract can agree to have the arbitrator decide unconscionability. An agreement to arbitrate the issue whether a dispute is subject to arbitration—i.e., the question of arbitrability—must be clear and unmistakable. (*Howsam v. Dean Witter Reynolds, Inc.* (2002) 537 U.S. 79, 83 [154 L.Ed.2d 491, 123 S.Ct. 588]; see also *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [131 L.Ed.2d 985, 115 S.Ct. 1920] ["Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."].) For reasons we will explain, the arbitration provisions at issue here did not meet that standard with respect to unconscionability.

The first paragraph of the arbitration provisions in the Atlas Account Agreements states: "The parties agree that any and all disputes, claims or controversies arising out of or relating to any transaction between them or to the breach, termination, *enforcement*, interpretation or validity of this Agreement, including the determination of the scope or applicability of this agreement to arbitrate, shall be submitted to final and binding arbitration before JAMS . . . ." (Italics added.) Monex argues that by this provision the parties agreed the arbitration panel must decide the issue of unconscionability. We disagree.

In *Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884 [71 Cal.Rptr.3d 854] (*Baker*), the court concluded an agreement to arbitrate did not clearly and unmistakably provide that issues of enforceability would be decided by the arbitrator. The arbitration provision stated: " 'Any disputes concerning the interpretation or the enforceability of this arbitration agreement, including without limitation, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel or laches, shall be decided by the arbitrator.' " (*Id.* at pp. 888–889.)

However, the agreement also contained a severability provision applicable if " ' "any provision of this arbitration agreement shall be determined by the arbitrator or *by any court* to be unenforceable. . . ." ' " (*Id.* at p. 891.) The *Baker* court concluded the arbitration agreement did not " 'clearly and unmistakably' " reserve to the arbitrator the issue whether the arbitration agreement was enforceable because "although one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the arbitrator, another provision indicated that the court might find a provision unenforceable." (*Id.* at pp. 894, 893.)

This case is similar to *Baker*. The Atlas Account Agreements include a severability provision stating, "[i]n the event that any provision of this Agreement shall be determined *by a trier of fact of competent jurisdiction* to be unenforceable in any jurisdiction, such provision shall be unenforceable in that jurisdiction and the remainder of this Agreement shall remain binding upon the parties as if such provision was not contained herein." (Italics added.) In contrast to *Baker*, the arbitration provisions of the Atlas Account Agreements refer to "arbitration" that is "heard by and determined by a panel of three (3) arbitrators." Use of the term "trier of fact of competent jurisdiction" instead of "arbitration panel" or "panel of three (3) arbitrators" suggests the trial court also may find a provision, including the arbitration provision, unenforceable. The arbitration provisions of the Atlas Account Agreements, as the one in *Baker*, did not " 'clearly and unmistakably' reserve" (*Baker, supra*, 159 Cal.App.4th at p. 894) to the arbitration panel the issue whether those arbitration provisions were unenforceable.

## II.

### *Review by Petition for Writ of Mandate Is Appropriate.*

Monex argues Petitioners have failed to show unique, extraordinary, or emergency circumstances required for review by petition for writ of mandate. We conclude review by writ petition is appropriate.

■ Orders compelling arbitration are considered interlocutory and not directly appealable. (*Zembsch v. Superior Court* (2006) 146 Cal.App.4th 153, 160 [53 Cal.Rptr.3d 69].) "Thus, writ review of orders directing parties to arbitrate is available only in 'unusual circumstances' or in 'exceptional situations.' " (*Ibid.*) As the court in *Zembsch v. Superior Court* explained, "California courts have held that writ review of orders compelling arbitration is proper in at least two circumstances: (1) if the matters ordered arbitrated fall clearly outside the scope of the arbitration agreement or (2) if the arbitration would appear to be unduly time consuming or expensive." (*Ibid.*)

In this case, the high cost of arbitrating before a three-judge panel at JAMS and the amount of time necessary to complete arbitration justify reviewing the order compelling arbitration by writ of mandate. "Writ review is the appropriate way to review the challenged order and avoid having parties try a case in a forum where they do not belong, only to have to do it all over again in the appropriate forum." (*Medeiros v. Superior Court* (2007) 146 Cal.App.4th 1008, 1014, fn. 7 [53 Cal.Rptr.3d 307].)

## III.

### *The Arbitration Panel Paragraphs and No Consolidation Paragraphs in the Atlas Account Agreements Are Unconscionable.*

A. *Standard of Review*

We review de novo a trial court's determination of the validity of an agreement to arbitrate when the evidence presented to the trial court was undisputed. (*Bruni v. Didion, supra,* 160 Cal.App.4th at p. 1282; *Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court* (2005) 133 Cal.App.4th 396, 406 [34 Cal.Rptr.3d 659].) We review under the substantial evidence standard the trial court's resolution of disputed facts. (*Bruni v. Didion, supra,* 160 Cal.App.4th at p. 1282.) "Whether an arbitration provision is unconscionable is ultimately a question of law. [Citations.]" (*Higgins v. Superior Court* (2006) 140 Cal.App.4th 1238, 1250 [45 Cal.Rptr.3d 293].)

Monex asserts the trial court found Petitioners were not under duress, the Atlas Account Agreements were not made on a "take-it-or-leave-it basis," and Petitioners did not submit evidence establishing their inability to pay their share of arbitration costs. The trial court did not make express findings. What Monex characterizes as findings were the trial court's comments, some hypothetical, made during the hearing on the motion to compel arbitration. Although the trial court made no express findings, we will infer the trial court made every implied finding necessary to support the order compelling arbitration, and review those implied findings for substantial evidence. (See *Kulko v. Superior Court* (1977) 19 Cal.3d 514, 519, fn. 1 [138 Cal.Rptr. 586, 564 P.2d 353]; *Murray v. Superior Court* (1955) 44 Cal.2d 611, 619 [284 P.2d 1].)

B. *General Principles of Unconscionability*

Unconscionability is codified in Civil Code section 1670.5, subdivision (a), which states: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court

may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

A panel of this court, in *Morris v. Redwood Empire Bancorp* (2005) 128 Cal.App.4th 1305 [27 Cal.Rptr.3d 797] (*Morris*), provided a thorough explanation of California unconscionability law:

█ "In California, two separate approaches have developed for determining whether a contract or provision thereof is unconscionable. One, based upon the common law doctrine, was outlined by the California Supreme Court in *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807 [171 Cal.Rptr. 604, 623 P.2d 165] (*Graham*). Under *Graham*, the court first determines whether an allegedly unconscionable contract is one of adhesion. [Fn. omitted.] Upon making this finding, the court then must determine whether (a) the contract term was outside of 'the reasonable expectations of the [weaker] part[y],' or (b) was 'unduly oppressive or "unconscionable." ' (*Graham*, at p. 820.)

"A separate test, based upon cases applying the Uniform Commercial Code unconscionability provision[,] views unconscionability as having 'procedural' and 'substantive' elements. (*A & M Produce Co. v. FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114] (*A & M Produce*).) 'The procedural element requires oppression or surprise. [Citation.] Oppression occurs where a contract involves lack of negotiation and meaningful choice, surprise where the allegedly unconscionable provision is hidden within a prolix printed form. [Citation.] The substantive element concerns whether a contractual provision reallocates risks in an objectively unreasonable or unexpected manner.' (*Jones v. Wells Fargo Bank* (2003) 112 Cal.App.4th 1527, 1539 [5 Cal.Rptr.3d 835] . . . .) Under this approach, both the procedural and substantive elements must be met before a contract or term will be deemed unconscionable. Both, however, need not be present to the same degree. A sliding scale is applied so that 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' (*Armendariz* [*v. Foundation Health Psychcare Services, Inc.* (2000)] 24 Cal.4th [83,] 114 [99 Cal.Rptr.2d 745, 6 P.3d 669].)

"Our Supreme Court in *Perdue* [*v. Crocker National Bank* (1985)] 38 Cal.3d 913 [216 Cal.Rptr. 345, 702 P.2d 503] . . . performed its unconscionability analysis exclusively under the *Graham* approach, but noted the two analytical approaches are not incompatible, declaring: 'Both pathways should lead to the same result.' (*Id.* at p. 925, fn. 9.) Many years later in *Armendariz*, the court approved both approaches without expressing a preference for either one. (*Armendariz, supra*, 24 Cal.4th at pp. 113–114.) In the recent case of

*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064 [130 Cal.Rptr.2d 892, 63 P.3d 979] . . . , our high court employed exclusively the procedural/substantive approach derived from *A & M Produce.*

■ "Each of the two approaches has generated some confusion in its application. For example, the *Graham* approach commences with a determination of whether the contract is one of adhesion, thus fostering the impression that a nonadhesion contract may never be unconscionable. In *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402 [7 Cal.Rptr.3d 418] . . . , however, we expressly recognized that a finding of adhesion was not a prerequisite to an unconscionability determination, and held unenforceable certain exculpatory provisions incorporated into, but not attached to, a nonadhesive contract.

"Similarly, under the two-pronged 'procedural' and 'substantive' test of *A & M Produce,* courts often reflexively conclude the finding of an adhesion contract alone satisfies the procedural prong, and immediately move on to the subject of substantive unconscionability. (See, e.g., *Flores* [*v. Transamerica HomeFirst, Inc.* (2001)] 93 Cal.App.4th [846,] 853 [113 Cal.Rptr.2d 376] ['A finding of a contract of adhesion is essentially a finding of procedural unconscionability'].) Consequently, other procedural issues, including surprise, often are ignored when balancing or weighing procedural and substantive unconscionability. Undue reliance on any one procedural factor to the exclusion of others may produce analytical myopia and obscure the larger unconscionability picture. This problem was recognized in *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] (*California Grocers*), where the court criticized the *A & M Produce* approach, noting: 'To speak in terms of "procedural" unconscionability is to elevate the fact of adhesiveness, which is not per se oppressive, to the same level as "substantive" unconscionability, thus tending to obscure the real issue.' (*California Grocers,* at p. 214.)

■ "Nonetheless, the procedural/substantive approach provides a useful framework when properly employed, and conforms more closely to cases decided under . . . section 2-302 of the Uniform Commercial Code, upon which California's unconscionability statute is based. (See *Perdue, supra,* 38 Cal.3d at p. 925, fns. 9 & 10.) Accordingly, we begin our analysis by considering the issue of procedural unconscionability with the following caveat in mind: Because procedural unconscionability must be measured in a sliding scale with substantive unconscionability, our task is not only to determine *whether* procedural unconscionability exists, but more importantly, *to what degree* it may exist." (*Morris, supra,* 128 Cal.App.4th at pp. 1317–1319.)

Both procedural and substantive unconscionability must be present for a court to refuse to enforce a contract provision under the doctrine of unconscionability. (*Armendariz v. Foundation Health Psychcare Services, Inc., supra*, 24 Cal.4th at p. 114 (*Armendariz*).) "But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.] In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*)

## C. *Procedural Unconscionability*

■ " ' "Procedural unconscionability" concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. [Citation.] It focuses on factors of oppression and surprise. [Citation.] The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party.' [Citation.]" (*Morris, supra*, 128 Cal.App.4th at p. 1319.)

### 1. *Adhesion Contract*

■ Following *Morris, supra*, 128 Cal.App.4th at page 1319, we commence our procedural unconscionability analysis by determining whether the Atlas Account Agreements were contracts of adhesion. A contract of adhesion is " 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Armendariz, supra*, 24 Cal.4th at p. 113.)

The Atlas Account Agreements are printed, standardized forms drafted by Monex. When the Atlas Account Agreements were signed, Petitioners were school teachers, a Federal Express driver, and a school janitor. Monex was the party of superior bargaining strength, and gave Petitioners the option of signing the Atlas Account Agreements or rejecting them, in which case Petitioner could not open a margin account.

Monex argues Petitioners had the opportunity to negotiate the terms of the Atlas Account Agreements, but none did so. However, the front page of the Atlas Account Agreements contains a proviso stating: "Any deletions from, additions to or cutting or mutilation of any portion of this Agreement will render the Agreement unacceptable." That proviso shows Petitioners were not

given "reasonable notice of [the] opportunity to negotiate or reject the terms of a contract, *and* . . . an actual, meaningful, and reasonable choice to exercise that discretion." (*Circuit City Stores, Inc. v. Mantor* (9th Cir. 2003) 335 F.3d 1101, 1106.)

We conclude the Atlas Account Agreements are contracts of adhesion. Any implied finding made by the trial court to the contrary would not be supported by substantial evidence.

### 2. *Surprise and Oppression*

■ Our conclusion the Atlas Account Agreements are adhesion contracts "heralds the beginning, not the end, of our inquiry into its enforceability." (*Morris, supra*, 128 Cal.App.4th at p. 1319.) A procedural unconscionability analysis also includes consideration of the factors of surprise and oppression. (*Higgins v. Superior Court, supra*, 140 Cal.App.4th at p. 1252.)

"Procedural surprise focuses on whether the challenged term is hidden in a prolix printed form or is otherwise beyond the reasonable expectation of the weaker party." (*Morris, supra*, 128 Cal.App.4th at p. 1321.) The arbitration provisions in the Atlas Account Agreements are not hidden, but consist of 11 paragraphs, each with a heading in bold typeface accurately describing the substance of the paragraph. The arbitration provisions are in the same typeface and font size as the rest of the provisions. Arbitration itself is a fairly common means of dispute resolution and would not be beyond the reasonable expectation of the weaker party. Each petitioner was given ample time to read and study the Atlas Account Agreements before signing them.

■ But the weaker party would not reasonably expect any dispute arising under the Atlas Account Agreements to be arbitrated before a panel of *three* private arbitrators, the fees for whom are not expressly set forth in the agreements. "While arbitration may be within the reasonable expectations of consumers, a process that builds prohibitively expensive fees into the arbitration process is not." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 90 [7 Cal.Rptr.3d 267] (*Gutierrez*).) The weaker party would not reasonably expect that his or her claims could not be joined with others in a single proceeding.

■ "Where the contract is one of adhesion, conspicuousness and clarity of language alone may not be enough to satisfy the requirement of awareness. Where a contractual provision would defeat the 'strong' expectation of the weaker party, it may also be necessary to call his attention to the language of the provision." (*Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 359–360 [133 Cal.Rptr. 775], citing *Smith v. Westland Life Ins. Co.* (1975) 15

Cal.3d 111, 122–123 [123 Cal.Rptr. 649, 539 P.2d 433].) The record here includes no evidence indicating whether Monex called attention to the arbitration provisions' requirement of three arbitrators.

Further, as Petitioners argue, the Atlas Account Agreements state the arbitration "shall be conducted in accordance with the provisions of JAMS Comprehensive Arbitration Rules and Procedures," but do not include copies of them. The Atlas Account Agreements do not refer to or include a JAMS fee schedule. In *Harper v. Ultimo, supra,* 113 Cal.App.4th at page 1406, a panel of this court found surprise because a contractual arbitration clause providing disputes would be resolved in accordance with the Better Business Bureau arbitration rules did not include or attach those rules. The court stated a customer would receive "a nasty shock" on later discovering the Better Business Bureau arbitration rules place severe limitations on liability. (*Ibid.*) Similarly here, a Monex customer might receive a nasty shock on learning of the amount of fees charged by JAMS for three arbitrators and of the requirement of depositing those fees in advance.

■ "Oppression refers not only to an absence of power to negotiate the terms of a contract, but also to the absence of reasonable market alternatives." (*Morris, supra,* 128 Cal.App.4th at p. 1320.) " 'In many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but also *any realistic opportunity to look elsewhere for a more favorable contract*; he must either adhere to the standardized agreement *or forego the needed service.*' " (*Ibid.,* quoting *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 711 [131 Cal.Rptr. 882, 552 P.2d 1178].) "Conversely, 'the "oppression" factor of the procedural element of unconscionability may be defeated, if the complaining party has a meaningful choice of reasonably available alternative sources of supply from which to obtain the desired goods and services free of the terms claimed to be unconscionable.' " (*Morris, supra,* 128 Cal.App.4th at p. 1320.)

Monex argues, "Petitioners' ability to invest in things other than precious metals, invest in precious metals through other vendors, invest in vehicles at Monex that did not require them to sign contracts, or not to invest at all is what forecloses any possibility of 'oppression' here." We agree Petitioners had many reasonable and realistic market alternatives to opening Monex Atlas accounts, including the option of not investing in precious metals at all. Investing in precious metals obviously is not a necessity: This is not a situation such as admittance to a hospital (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441]) or employment (*Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1071 [130 Cal.Rptr.2d 892, 63 P.3d 979] (*Little*)), in which an adhesion contract might be oppressive despite the availability of alternatives.

██ Monex is incorrect in arguing the existence of reasonable alternatives is dispositive of the issue of oppression. In *Nagrampa v. MailCoups, Inc.* (9th Cir. 2006) 469 F.3d 1257, 1283, an en banc panel of the Ninth Circuit Court of Appeals correctly stated, "[t]he California Court of Appeal has rejected the notion that the availability in the marketplace of substitute employment, goods, or services *alone* can defeat a claim of procedural unconscionability." The availability of reasonable alternatives is but one factor (along with absence of power to negotiate terms) used in considering oppression.

### 3. *Conclusion: Procedural Unconscionability*

In sum, there are elements of procedural unconscionability in the Atlas Account Agreements: They are contracts of adhesion; Petitioners were in the weaker bargaining position and could not negotiate terms; the requirement of a three-judge arbitration panel and prohibition on consolidation or joinder were beyond Petitioners' reasonable expectations; and Monex did not call Petitioners' attention to the Arbitration Panel paragraphs and No Consolidation paragraphs. There also are elements contrary to procedural unconscionability: The arbitration provisions are not hidden in a prolix form, and Petitioners had many realistic alternatives to opening the Monex Atlas accounts. Considered as a whole, the elements both supporting and contrary to a finding of procedural unconscionability lead to our conclusion of a low to medium degree of procedural unconscionability in the Atlas Account Agreements.

### D. *Substantive Unconscionability*

██ "A provision is substantively unconscionable if it 'involves contract terms that are so one-sided as to "shock the conscience," or that impose harsh or oppressive terms.' " (*Morris, supra*, 128 Cal.App.4th at p. 1322.) Substantive unconscionability may be shown if the disputed contract provision falls outside the nondrafting party's reasonable expectations. (*Gutierrez, supra*, 114 Cal.App.4th at p. 88.)

Petitioners argue the arbitration provisions of the Atlas Account Agreements are substantively unconscionable because they require arbitration before a panel of three arbitrators rather than one, the arbitrators must be from JAMS, the JAMS fees would be in excess of $12,000 per day for each day of arbitration, and the cost of the arbitrators is split evenly between Monex and the investor. In addition, the arbitration provisions prohibit the consolidation or joinder of claims, so each investor must initiate a separate

arbitration and pay one-half the cost of three arbitrators.[3] Monex argues the Arbitration Panel paragraphs are not substantively unconscionable because Petitioners presented no evidence showing they could not afford arbitration when they signed the Atlas Account Agreements.

As we shall explain, the Arbitration Panel paragraphs and No Consolidation paragraphs in the Atlas Account Agreements are substantively unconscionable to a high degree. Petitioners presented evidence establishing the cost of a single day of arbitration would be at least $3,200 per arbitrator, plus additional case management fees charged by JAMS. Petitioners submitted evidence of their income, expenses, and savings showing their inability to pay those fees at the time they signed the Atlas Account Agreements. Each petitioner must arbitrate separately and fully bear one-half the arbitration costs and fees because the No Consolidation paragraphs prohibit joinder of claims. Tellingly, Monex offers no justification for requiring arbitration before three arbitrators rather than one: The primary, if not only, purpose of the three-arbitrator requirement in the Atlas Account Agreements could only be to discourage claims against Monex.

### 1. Green Tree *and Its Progeny*

Based on *Green Tree Financial Corp.-Ala. v. Randolph* (2000) 531 U.S. 79 [148 L.Ed.2d 373, 121 S.Ct. 513] (*Green Tree*), amicus curiae Cornell Securities Law Clinic argues the arbitration provisions in the Atlas Account Agreements are substantively unconscionable "due to the prohibitive costs [they] impose[] upon Petitioners." In *Green Tree*, the plaintiff, a purchaser of a mobilehome, sued her lender for violation of federal statutes, including the Truth in Lending Act, 15 United States Code section 1601 et seq. (TILA). (*Green Tree, supra*, 531 U.S. at pp. 82–83.) The plaintiff's agreement with the lender included a binding arbitration clause covering all statutory claims. (*Id.* at p. 83, fn. 1.) The agreement was silent on the issue of allocating costs of arbitration. (*Id.* at pp. 83, fn. 1, 89.) The district court granted the lender's motion to compel arbitration, but the court of appeals reversed, holding the agreement "posed a risk that [the plaintiff]'s ability to vindicate her statutory rights would be undone by 'steep' arbitration costs, and therefore was unenforceable." (*Id.* at pp. 83–84.)

The United States Supreme Court reversed the court of appeals. (*Green Tree, supra*, 531 U.S. at p. 84.) The Supreme Court recognized that statutory

---

[3] Petitioners acknowledge the No Consolidation paragraphs but state, "this issue was not raised by Monex in the proceeding below." More importantly, Monex does not directly address the No Consolidation paragraphs in the return, and argues affordability as though those paragraphs did not exist. While we might view this as a concession the No Consolidation paragraphs are unconscionable, we address the unconscionability of those paragraphs on the merits.

claims are arbitrable under the Federal Arbitration Act, 9 United States Code section 1 et seq. (FAA), unless Congress expressed a contrary intent, because " ' "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum," ' " the statute serves its functions." (*Green Tree, supra*, 531 U.S. at p. 90.) Because the TILA did not "evince[] an intention to preclude a waiver of judicial remedies," the court turned to the plaintiff's assertion the arbitration agreement's silence on costs and fees created the risk that prohibitive arbitration costs would leave her unable to vindicate her statutory rights. (*Green Tree, supra*, 531 U.S. at p. 90.) The Supreme Court stated: "It may well be that the existence of large arbitration costs could preclude a litigant such as [the plaintiff] from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that [the plaintiff] will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter. As the Court of Appeals recognized, 'we lack . . . information about how claimants fare under Green Tree's arbitration clause.' [Citation.] The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." (*Id.* at pp. 90–91, fn. omitted.)

The Supreme Court declined to invalidate the arbitration agreement based on speculation as to costs because doing so "would undermine the 'liberal federal policy favoring arbitration agreements' " and "conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." (*Green Tree, supra*, 531 U.S. at p. 91.) The court concluded: "[W]e believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. [The plaintiff] did not meet that burden. How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss . . . ." (*Id.* at p. 92.)

As the amicus curiae brief explains, many federal and state courts have cited *Green Tree* as creating a case-by-case "prohibitively expensive" standard for determining whether to enforce an arbitration agreement. (E.g., *Musnick v. King Motor Co. of Fort Lauderdale* (11th Cir. 2003) 325 F.3d 1255, 1259 ["The party seeking to avoid arbitration . . . has the burden of establishing that enforcement of the agreement would 'preclude' him from 'effectively vindicating [his] federal statutory right in the arbitral forum.' "]; *Blair v. Scott Specialty Gases* (3d Cir. 2002) 283 F.3d 595, 610 (*Blair*); *Burden v. Check Into Cash of Kentucky, LLC* (6th Cir. 2001) 267 F.3d 483, 492 [*Green Tree* requires party resisting arbitration to show likelihood of prohibitive expenses]; *Bradford v. Rockwell Semiconductor Systems, Inc.* (4th Cir.

2001) 238 F.3d 549, 556–557 (*Bradford*); *Guadagno v. E\*Trade Bank* (C.D.Cal. 2008) 592 F.Supp.2d 1263, 1272; *Ting v. AT & T* (N.D.Cal. 2002) 182 F.Supp.2d 902, 933–934, revd. on another ground (9th Cir. 2003) 319 F.3d 1126; *Tillman v. Commercial Credit Loans, Inc.* (2008) 362 N.C. 93, 104–105 [655 S.E.2d 362]; *Bess v. DirecTV, Inc.* (2008) 381 Ill.App.3d 229, 240–241 [319 Ill.Dec. 217, 885 N.E.2d 488]; *In re December Nine Company, Ltd.* (Tex.Ct.App. 2006) 225 S.W.3d 693, 702–703; *Roddie v. North American Manufactured Homes, Inc.* (Ind.Ct.App. 2006) 851 N.E.2d 1281, 1285; *Crawford v. Great American Cash Advance, Inc.* (2007) 284 Ga.App. 690, 693 [644 S.E.2d 522].) In *Bradford, supra,* 238 F.3d 549, 556, the court concluded: "[T]he appropriate inquiry is one that evaluates whether the arbitral forum in a particular case is an adequate and accessible substitute to litigation, i.e., a case-by-case analysis that focuses, among other things, upon the claimant's ability to pay the arbitration fees and costs, the expected cost differential between arbitration and litigation in court, and whether that cost differential is so substantial as to deter the bringing of claims."

In *Blair, supra,* 283 F.3d at page 610, the court analyzed an arbitration agreement under *Green Tree* and decided: "[A] remand is appropriate in light of [the plaintiff]'s affidavit of her limited financial capacity, the evidence that the AAA [American Arbitration Association] would preside over the arbitration, and the AAA rules requiring the parties to bear equally the costs of the arbitrator's fees. Limited discovery into the rates charged by the AAA and the approximate length of similar arbitration proceedings should adequately establish the costs of arbitration, and give [the plaintiff] the opportunity to prove, as required under *Green Tree,* that resort to arbitration would deny her a forum to vindicate her statutory rights. [The defendant] should also be given the opportunity to meet its burden to prove that arbitration will not be prohibitively expensive, or as has been suggested in other cases, offer to pay all of the arbitrator's fees."

2. *California Law*: Armendariz, Little, Gutierrez, *and* Boghos

In California, treatment of *Green Tree* has taken a somewhat different trajectory. "Though the California and United States Supreme Courts agree that arbitral costs may impair the vindication of statutory rights, once again, each has adopted a different method for reaching this determination." (*Gutierrez, supra,* 114 Cal.App.4th at p. 95.)

In *Armendariz, supra,* 24 Cal.4th at pages 110–111, the California Supreme Court held that when an employer imposes mandatory arbitration as a condition of employment, and the arbitration agreement is silent on allocation of costs, the employer must bear all costs associated in arbitrating claims under the California Fair Employment and Housing Act (FEHA) (Gov. Code,

§ 12900 et seq.). The *Armendariz* court concluded, "[t]his rule will ensure that employees bringing FEHA claims will not be deterred by costs greater than the usual costs incurred during litigation, costs that are essentially imposed on an employee by the employer." (*Armendariz, supra,* 24 Cal.4th at p. 111.) Under *Armendariz,* an arbitration provision, silent on costs, that is imposed as a condition of employment, is enforceable but the employer must bear all arbitration costs. (*Id.* at pp. 110–111.) Under *Green Tree,* an arbitration agreement, silent on costs, is unenforceable under the FAA if arbitration is "prohibitively expensive" and the party opposing arbitration meets its burden of showing the likelihood of incurring such costs. (*Green Tree, supra,* 531 U.S. at p. 92.)

In *Little, supra,* 29 Cal.4th 1064, the California Supreme Court extended the cost-shifting requirements of *Armendariz* to employer-mandated arbitration of tort claims for wrongful discharge in violation of public policy. The court rejected an argument that *Green Tree* supplanted the cost-shifting holding of *Armendariz.* (*Little, supra,* 29 Cal.4th at p. 1082.) The court explained the relationship between *Armendariz* and *Green Tree*: "*Armendariz* and *Green Tree* agree on two fundamental tenets. First, silence about costs in an arbitration agreement is not grounds for denying a motion to compel arbitration. Second, arbitration costs can present significant barriers to the vindication of statutory rights. Nonetheless, there may be a significant difference between the two cases. Although *Green Tree* did not elaborate on the kinds of cost-sharing arrangements that would be unenforceable, dicta in that case, and several federal cases cited above interpreting it, suggest that federal law requires only that employers not impose 'prohibitively expensive' arbitration costs on the employee [citation], and that determination of whether such costs have been imposed are to be made on a case-by-case basis. *Armendariz,* on the other hand, categorically imposes costs unique to arbitration on employers when unwaivable rights pursuant to a mandatory employment arbitration agreement are at stake. Assuming that *Green Tree* and *Armendariz* pose solutions to the problem of arbitration costs that are in some respects different, we do not agree with amicus curiae that the FAA requires states to comply with federal arbitration cost-sharing standards." (*Little, supra,* 29 Cal.4th at p. 1084.)

The *Little* court concluded the FAA did not preempt *Armendariz*'s cost-shifting requirement because that requirement was "derived from state contract law principles regarding the unwaivability of certain public rights in the context of a contract of adhesion." (*Little, supra,* 29 Cal.4th at p. 1084.) The *Little* court stated: "Furthermore, we considered and rejected in *Armendariz* a case-by-case approach to arbitration costs similar to that suggested by courts interpreting *Green Tree* based on the differential between projected arbitration and litigation fees." (*Ibid.*)

In *Gutierrez, supra*, 114 Cal.App.4th at page 83, the Court of Appeal analyzed *Armendariz, Green Tree*, and *Little* to conclude "consumers may challenge a predispute arbitration clause as unconscionable if the fees required to initiate the process are unaffordable, and the agreement fails to provide the consumer an effective opportunity to seek a fee waiver." In *Gutierrez, supra*, 114 Cal.App.4th at pages 83–84, the plaintiffs entered into an automobile lease with the defendants, which included a provision requiring disputes to be arbitrated in accordance with American Arbitration Association (AAA) rules. The plaintiffs were not informed of the arbitration provision or given a copy of the AAA rules. (*Id.* at p. 84.) They sued the defendants for fraud and negligent misrepresentation, for violations of the California Vehicle Leasing Act (Civ. Code, § 2985.7 et seq.), the UCL, and California's Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), and for false advertising (Bus. & Prof. Code, § 17500 et seq.). (*Gutierrez, supra*, 114 Cal.App.4th at pp. 84–85.)

One of the defendants filed a petition to compel arbitration pursuant to the lease's arbitration provision. (*Gutierrez, supra*, 114 Cal.App.4th at p. 85.) The trial court denied the petition on the ground the arbitration fee provision was unenforceable and could not be severed from the arbitration clause. (*Ibid.*)

The Court of Appeal agreed the arbitration provision was both procedurally and substantively unconscionable. Independently of *Green Tree*, the *Gutierrez* court concluded: "[W]here a consumer enters into an adhesive contract that mandates arbitration, it is unconscionable to condition that process on the consumer posting fees he or she cannot pay. It is self-evident that such a provision is unduly harsh and one-sided, defeats the expectations of the nondrafting party, and shocks the conscience. While arbitration may be within the reasonable expectations of consumers, a process that builds prohibitively expensive fees into the arbitration process is not. [Citation.] To state it simply: it is substantively unconscionable to require a consumer to give up the right to utilize the judicial system, while imposing arbitral forum fees that are prohibitively high. Whatever preference for arbitration might exist, it is not served by an adhesive agreement that effectively blocks every forum for the redress of disputes, including arbitration itself." (*Gutierrez, supra*, 114 Cal.App.4th at pp. 89–90, fns. omitted.)

In the trial court, the plaintiffs in *Gutierrez* presented evidence of their inability to pay, including a declaration setting forth income, expenses, and savings. (*Gutierrez, supra*, 114 Cal.App.4th at p. 90.) The plaintiffs also submitted a declaration from an AAA administrator explaining the calculation of costs under AAA rules. (*Id.* at p. 91.) The appellate court also found significant the fact there was no effective procedure for a consumer to obtain a fee waiver or reduction. (*Ibid.*)

The *Gutierrez* court then considered the effect of the arbitration provision on the plaintiffs' ability to vindicate their statutory rights, and explained the different approaches taken by federal and California courts in shifting or allocating arbitration costs. Comparing *Green Tree, Little*, and *Armendariz*, the court concluded a mandatory arbitration agreement encompassing unwaivable statutory rights may not impose forum fees exceeding the consumer's ability to pay. (*Gutierrez, supra*, 114 Cal.App.4th at pp. 94–97.) When a plaintiff seeks to vindicate his or her statutory rights, an additional agreement will be implied "that unaffordable fees are not to be imposed at the time of the award," unless there is express language to the contrary in the agreement. (*Id.* at p. 99.) "Implying this additional agreement ensures that consumers will not be deterred from pursuing their statutory claims by the fear that the arbitrator will allocate unaffordable fees to them." (*Id.* at pp. 99–100.) The *Gutierrez* court concluded the provision requiring the plaintiffs to pay substantial arbitration fees was unconscionable, and remanded the case for the trial court to determine whether the cost provision could be severed from the arbitration agreement. (*Id.* at p. 93.)

In *Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 507 [30 Cal.Rptr.3d 787, 115 P.3d 68] (*Boghos*), the California Supreme Court held the cost-shifting rule for arbitration of certain statutory claims set forth in *Armendariz, supra*, 24 Cal.4th 83, and *Little, supra*, 29 Cal.4th 1064, did not extend to common law claims. The Supreme Court therefore reversed the Court of Appeal, which had rejected an arbitration provision on that ground, and remanded for a further determination of unconscionability. (*Boghos, supra*, 36 Cal.4th at pp. 499, 508–509.) The Supreme Court noted several issues to be decided on remand, including "whether Boghos's ability to pay his share of the costs and fees is relevant to the question of unconscionability and, if so, whether he must prove he is factually unable to pay." (*Id.* at p. 508.)

The preceding cases offer three approaches to resolving the issue of prohibitively high arbitration fees. One approach, the fee-shifting principle of *Armendariz* and *Little*, does not apply here because this case does not arise under the FEHA or involve claims for wrongful termination of employment in violation of public policy. Another approach—that of the FAA—is inapplicable because the Atlas Account Agreements provide they are governed by California law. Thus, we do not have authority to declare an arbitration provision unenforceable solely on the ground the arbitration fees are "prohibitively expensive" without undertaking an unconscionability analysis. We follow the approach taken in *Gutierrez*, and noted in *Boghos*, of considering the amount of arbitration fees and costs, and the ability of the party resisting arbitration to pay them, as factors in assessing substantive unconscionability of a predispute arbitration agreement.

Monex argues *Gutierrez* should not be extended to Petitioners because they are investors, not consumers, and therefore deserve less protection from high arbitration fees. Although *Gutierrez* concerned a consumer contract, its reasoning extends to an investor contract that includes "prohibitively high" arbitration fees that are not within an investor's reasonable expectations. (*Gutierrez, supra,* 114 Cal.App.4th at p. 90.) As amicus curiae points out, cases have applied *Green Tree* to investor contracts. (E.g., *Guadagno v. E\*Trade Bank, supra,* 592 F.Supp.2d at p. 1272; cf. *Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court, supra,* 133 Cal.App.4th at pp. 415–417 [applying *Gutierrez's* cost-shifting analysis to franchise contracts].) Indeed, the Atlas Account Agreements do not use the word "investors," but refer to Petitioners as "*Customer[s]*" (italics added).

### 3. *Arbitration Fees and Costs*

In opposition to the motion to compel arbitration, Petitioners submitted a copy of the JAMS rules and procedures and the fee schedules for 11 attorney arbitrators and retired judges associated with JAMS. Two of them charged $400 per hour, one charged $425 per hour, one charged $450 per hour, one charged $500 per hour, one charged $600 per hour or $7,000 per day, one charged $5,500 per day, three charged $6,000 per day, and one charged $5,750 per day. The rates are essentially undisputed.[4] In addition, JAMS charges a nonrefundable case management fee of $400 per party, per day, with an additional 10 percent of professional fees for time in excess of 30 hours.

At those rates, the least expensive JAMS arbitrator would charge $3,200 for an eight-hour day. Three arbitrators at that rate would cost $9,600 for an eight-hour day. A four-day arbitration would cost $38,400. Each petitioner would have to pay half that amount, which would be $19,200—plus $1,600 in case management fees per party—for a total of $20,800. Since the Atlas Account Agreements do not permit consolidation or joinder of claims, each Petitioner would have to initiate a separate arbitration and pay $20,800 *minimum* in fees for a four-day arbitration, regardless of the amount in controversy. If the arbitrator fees were higher than $400 per hour, or if the arbitration lasted longer than four days or 30 hours (the threshold for the JAMS 10 percent surcharge), the fees would be higher.

---

[4] Monex submitted a declaration from Attorney Aaron C. Watts, stating: "I spoke with a case coordinator at JAMS, who explained that arbitrator's rates range from $450 to $550 an hour. Accordingly, a full day of mediation would cost approximately $4,000 ($500 [x] 8 hours), $2000 to be paid by Defendants, and the remaining $2000 to be split among the three Plaintiffs (approximately $650 per day). I would not expect the arbitration hearing to last any longer than four days. Accordingly, the collective cost to each Plaintiff would be less than $3,000." This declaration ignores the Atlas Account Agreements' prohibition on joinder or consolidation of disputes and controversies.

The JAMS rules, as the AAA rules at issue in *Gutierrez*, require each party to deposit the fees and expenses for the arbitration before the hearing. If a party fails to deposit its pro rata or agreed-upon share of fees and expenses before the hearing, the arbitrator may preclude that party from presenting evidence to support a claim. JAMS may waive the fee deposit requirement "upon a showing of good cause."

The requirement of a three-arbitrator panel, the prohibition on consolidation or joinder, and the evidence of the rates charged by JAMS arbitrators and judges evince a high degree of substantive unconscionability in light of the amount of recovery sought by Petitioners. As explained, the cost of a three-arbitrator panel at JAMS for a four-day arbitration would be at least $38,400 plus case management fees of at least $3,200. To arbitrate a claim, each party thus would have to pay at least $20,800, and would have to deposit that amount before the arbitration hearing. Such arbitration costs are prohibitive for losses ranging from $44,000 to $130,000. In *Popovich v. McDonald's Corp.* (N.D.Ill. 2002) 189 F.Supp.2d 772, 776–778, the district court concluded the plaintiff had met his burden under *Green Tree* of proving the cost of arbitration would be prohibitive by submitting evidence that arbitration fees were "likely to be as much as $48,000 and perhaps as high as $126,000" for a claim seeking $20 million in damages.[5]

Requiring three arbitrators to resolve a dispute is not always unwarranted, and parties might have good reason to arbitrate before three arbitrators instead of one. But Monex offers no justification for the requirement of three arbitrators in the Atlas Account Agreements: Monex does not claim, for example, that claims arising under the Atlas Account Agreements would be so complex as to require the joint expertise of three arbitrators, or the parties would be unable to agree on a single neutral arbitrator. Monex did not present evidence of the Atlas Account Agreements' "commercial setting, purpose, and effect" to justify a three-arbitrator panel from JAMS (Civ. Code, § 1670.5, subd. (b)), and Monex cites no cases upholding a requirement of three arbitrators.

Further, Monex offers no explanation or justification for the prohibition on consolidation or joinder of claims. The prohibition on consolidation or joinder merely drives up the cost per party of arbitration. For all parties, including Monex, joinder or consolidation of multiple claims could provide a

---

[5] Amicus curiae argues that the court in *Phillips v. Associates Home Equity Services, Inc.* (N.D.Ill. 2001) 179 F.Supp.2d 840 also found substantive unconscionability based solely on evidence of the amount of arbitration fees and a declaration stating the plaintiff could not afford to pay them. However, the defendants in that case did not argue the plaintiff could afford the costs of arbitration, but argued the arbitration rules contained safeguards to protect the plaintiff from incurring exorbitant costs. (*Id.* at p. 846.)

more cost-effective means of resolving multiple disputes.[6] The primary, if not only, reason for requiring arbitration of disputes before a panel of three arbitrators from JAMS, for prohibiting consolidation or joinder of claims, and for splitting the costs of arbitration, must be to discourage or prevent Monex customers from vindicating their rights.

Monex argues the Atlas Account Agreements give the arbitrator discretion to allocate costs and the arbitrator's fees. "This possibility, however, provides little comfort to consumers like plaintiffs here, who cannot afford to initiate the arbitration process in the first place." (*Gutierrez, supra,* 114 Cal.App.4th at p. 90.) The JAMS rules require each party to deposit fees and costs before the arbitration hearing. Although JAMS might waive the requirement of a deposit for good cause, the waiver is within JAMS's discretion, and the record contains no showing of how a litigant might obtain a waiver of the deposit. "To the extent the . . . rules create a procedure to ensure fees are affordable, it is ineffective." (*Gutierrez, supra,* 114 Cal.App.4th at p. 92.)

Monex also argues the arbitration provisions are not substantively unconscionable because the costs of arbitration, even with arbitration fees and costs, would be less than the cost of litigating in court. The *Armendariz* court criticized that approach, stating: "Turning a motion to compel arbitration into a mini-trial on the comparative costs and benefits of arbitration and litigation for a particular [litigant] would not only be burdensome on the trial court and the parties, but would likely yield speculative answers." (*Armendariz, supra,* 24 Cal.4th at p. 111.) We agree with *Gutierrez, supra,* 114 Cal.App.4th at page 98 that "[e]ven if the calculation is made at the close of arbitration, when its costs are fixed, the costs of a litigation that will never occur is entirely speculative, particularly because no sensible prediction can be made as to whether the case would have been tried or settled."

### 4. *Petitioners' Ability to Pay*

Consideration of Petitioners' ability to pay the substantial arbitration fees and costs reinforces the conclusion the arbitration provisions in the Atlas Account Agreements are substantively unconscionable. In opposition to the motion to compel arbitration, all Petitioners submitted declarations, dated in September 2008, stating each could not afford the cost of arbitration before a panel of three arbitrators at JAMS.

Navarrete, who was unemployed in September 2008, submitted a declaration showing that when he signed the Atlas Account Agreements, he earned

---

[6] In some circumstances, class action waivers in consumer contracts of adhesion are unenforceable under California law. (*Discover Bank v. Superior Court, supra,* 36 Cal.4th 148, 153.) We are not asked to determine whether the arbitration provisions' prohibition on consolidation or joinder of claims is in itself unenforceable.

an annual salary of $55,000 as an elementary school custodian. As of September 2008, he received monthly unemployment benefits of $960, and had monthly expenses of about $2,500. He owned a home worth about $350,000 subject to a mortgage of $100,000, three vehicles with a total value of $5,500, and furniture. He owned no other substantial assets. His bank account balance as of September 2008 was $1,000 to $1,500.

Elizabeth Parada submitted a declaration showing that she and her husband are school teachers. In September 2008, they had a combined monthly income of $5,500 ($66,000 divided by 12 months) and had monthly expenses (including mortgage payments, car loan payments, and credit card payments) of $6,870. The Paradas owned a home worth about $189,000 subject to liabilities of $290,000. The Paradas owned two automobiles with a combined value of about $32,000, had $2,000 in a bank account, and owned no other substantial assets.

Fernando Perez submitted a declaration showing that in September 2008, he and his wife had a combined monthly income of $5,833 ($70,000 divided by 12 months) and combined monthly expenses of about $4,500. The Perezes owned two automobiles (together worth about $29,000) that were subject to loans totaling $35,000. Their home was foreclosed on in January 2008. They owned a time-share worth about $23,000 subject to a loan of $28,000.

■ Monex argues the declarations were insufficient because they reflect ability to pay only at the time of the motion to compel arbitration, not at the time Petitioners entered into the Atlas Account Agreements. Generally, "unconscionability is determined as of the time the contract was entered into, not in light of subsequent events." (*Morris, supra,* 128 Cal.App.4th at p. 1324; see also *Gutierrez, supra,* 114 Cal.App.4th at p. 91.) Civil Code section 1670.5, subdivision (a) permits a court to refuse to enforce a contract "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made . . . ." Determining ability to pay at the time a party seeks to enforce a contract is contrary to statute and would make enforceability subject to change based on factors potentially outside the knowledge and control of the party seeking to enforce arbitration.[7]

The declarations submitted by Petitioners nonetheless reasonably reflect their inability to pay at the time they signed the Atlas Account Agreements.

---

[7] In *Gutierrez, supra,* 114 Cal.App.4th at pages 90–91, the Court of Appeal considered a plaintiff's declaration setting forth income, expenses, and savings, and the AAA rules in effect at the time the defendant moved to compel arbitration. Our conclusion that ability to pay must be determined at the time the contract is made is not inconsistent with *Gutierrez* because in that case, the defendant did not dispute the plaintiffs' inability to pay. (*Id.* at p. 91, fn. 13.)

Petitioners were of limited means when they signed their declarations in September 2008. Navarrete was unemployed in September 2008, but his declaration set forth his income when he signed the Atlas Account Agreements. The Parada and Perez declarations do not suggest they had experienced any change in income or expenses since the time the Atlas Account Agreements were signed.

Monex argues we must consider the substantial sums Petitioners invested in determining their ability to pay arbitration fees and costs. Petitioners allege they lost their investments due to Monex, so considering the amounts they invested would only reward Monex for its alleged wrongful conduct. Even when including the amount each petitioner invested with Monex in considering financial worth and ability to pay, the arbitration fees and costs are prohibitively high, and would substantially discourage or prevent vindication of statutory rights. The minimum per party arbitration fees and costs of $20,800 would be 14.86 percent of the Paradas' investment of $140,000; 16 percent of Navarrete's investment of $130,000; and 48.37 percent of the Perezes' investment of $43,000.

Monex argues ability to pay should not be considered because it has offered to decrease the number of arbitrators from three to one. We concluded that for ability to pay, unconscionability is determined as of the time the contract was made. Similarly, we consider unconscionability of the three-arbitrator requirement at the time the Atlas Account Agreements were signed, and decline to consider Monex's postdispute offer to arbitrate before a single arbitrator. "[C]ourts should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs where the agreement itself provides that the plaintiff is liable . . . . [T]he [drafter] is saddled with the consequences of the provision *as drafted*. If the provision, as drafted, would deter potential litigants, then it is unenforceable, regardless of whether, in a particular case, the employer agrees to pay a particular litigant's share of the fees and costs to avoid such a holding." (*Morrison v. Circuit City Stores, Inc.* (6th Cir. 2003) 317 F.3d 646, 676–677.) Monex's later willingness to alter the arbitration provision "does not change the fact that the arbitration agreement as written is unconscionable and contrary to public policy." (*Armendariz, supra*, 24 Cal.4th at p. 125; see also *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, 1536 [60 Cal.Rptr.2d 138] ["No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it."].)

E. *Conclusion: The Sliding Scale Analysis*

Having determined the presence and degree of procedural and substantive unconscionability, we return to the sliding scale measurement to determine whether the Arbitration Panel paragraphs and No Consolidation paragraphs of

the Atlas Account Agreements are enforceable. (*Morris, supra*, 128 Cal.App.4th at pp. 1318–1319.) We concluded the Atlas Account Agreements fall in the low-to-middle range of the procedural unconscionability scale. Without considering each petitioner's ability to pay, the unjustified requirement of a panel of three arbitrators from JAMS and the prohibition on consolidation or joinder of claims render the Arbitration Panel paragraphs and No Consolidation paragraphs substantively unconscionable to a high degree. Consideration of Petitioners' ability to pay pushes those paragraphs even further into substantive unconscionability territory.

On the sliding scale, this low- to mid-range amount of procedural unconscionability and the high degree of substantive unconscionability render the Arbitration Panel paragraphs and No Consolidation paragraphs of the Atlas Account Agreements unconscionable and, hence, unenforceable.

Our conclusion is not inconsistent with Judge David O. Carter's order in *Cronin v. Monex Deposit Co.* (C.D.Cal., Feb. 17, 2009, No. SACV 08-1297 DOC (MLGx)) 2009 U.S.Dist. Lexis 16938, which found the same Atlas Account Agreements' arbitration provisions to be enforceable. In *Cronin*, the plaintiff did not assert unconscionability based on the cost of, or ability to pay for, a three-arbitrator panel from JAMS. Rather, the plaintiff argued the arbitration provisions were substantively unconscionable on two grounds: (1) they limited access to discovery, and (2) they were "one-sided" because Monex was more likely to sue than be sued. (*Id.* at pp. *22–*24.) Thus, Judge Carter did not have reason to consider whether the requirement of three JAMS arbitrators and the prohibition on consolidation or joinder of claims rendered the arbitration provisions procedurally or substantively unconscionable.

## IV.

### *The Unenforceable Arbitration Provisions Are Not Severable.*

Monex argues we should sever any part of the arbitration provisions that we conclude is unenforceable. Civil Code section 1670.5, subdivision (a) provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

In *Armendariz*, the court explained the circumstances under which severance should be granted. First, "[c]ourts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be

extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Armendariz, supra*, 24 Cal.4th at p. 124.)

 The *Armendariz* court explained too that a court may refuse to sever a contract provision with multiple unconscionable terms: "[M]ultiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage." (*Armendariz, supra*, 24 Cal.4th at p. 124.) Such permeation may be shown by "the fact that there is no single provision a court can strike or restrict in order to remove the unconscionable taint from the agreement." (*Id.* at pp. 124–125.) Severance is not permitted if the court would be required to augment the contract with additional terms. (*Id.* at p. 125.) "Civil Code section 1670.5 does not authorize such reformation by augmentation, nor does the arbitration statute. Code of Civil Procedure section 1281.2 authorizes the court to refuse arbitration if grounds for revocation exist, not to reform the agreement to make it lawful. Nor do courts have any such power under their inherent limited authority to reform contracts. [Citations.] Because a court is unable to cure this unconscionability through severance or restriction and is not permitted to cure it through reformation and augmentation, it must void the entire agreement." (*Ibid.*)

 The *Armendariz* court also concluded an unconscionable arbitration term should not be severed if drafted in bad faith because severing such a term and enforcing the arbitration provision would encourage drafters to overreach. (*Armendariz, supra*, 24 Cal.4th at pp. 124–125, fn. 13.) "An employer will not be deterred from routinely inserting . . . a deliberately illegal clause into the arbitration agreements it mandates for its employees if it knows that the worst penalty for such illegality is the severance of the clause after the employee has litigated the matter. In that sense, the enforcement of a form arbitration agreement containing such a clause drafted in bad faith would be condoning, or at least not discouraging, an illegal scheme, and severance would be disfavored unless it were for some other reason in the interests of justice." (*Ibid.*)

 We decline to sever the Arbitration Panel paragraphs and No Consolidation paragraphs from the Atlas Account Agreements under those principles. When Petitioners signed the Atlas Account Agreements in 2006, *Green Tree, Armendariz, Gutierrez, Boghos, Bradford, Blair,* and *Popovich v. McDonald's Corp.* had been decided and published. It is reasonably clear from these cases, and the authority interpreting them, that requiring Petitioners to arbitrate disputes before a panel of three arbitrators from JAMS and to prohibit consolidation or joinder of claims would have been so prohibitively expensive as to be unconscionable at the time the Atlas Account Agreements were signed. Monex's failure to offer a justification or explanation for

requiring three arbitrators instead of one demonstrates it included the Arbitration Panel paragraphs and No Consolidation paragraphs in the Atlas Account Agreements deliberately for the improper purpose of discouraging or preventing its customers from vindicating their rights.

Because the Arbitration Panel paragraphs and No Consolidation paragraphs cannot be severed, the arbitration provisions in their entirety are unenforceable.

### Disposition and Order

The petition for writ of mandate is granted. Let a writ of mandate issue directing the superior court to vacate its order granting the motion of real parties in interest to compel arbitration and to issue a new and different order denying the motion. Petitioners shall recover costs incurred in this proceeding.

Sills, P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied September 23, 2009, and the petition of real parties in interest for review by the Supreme Court was denied November 10, 2009, S176868.