Filed 1/30/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CASANDRA MURREY, | |
| Petitioner, | |
| v. | G061329 |
| THE SUPERIOR COURT OF ORANGE COUNTY, | (Super. Ct. No. 30-2021-01191732) |
| Respondent; | O P I N I O N |
| GENERAL ELECTRIC COMPANY et al., | |
| Real Parties in Interest. | |

Petition for extraordinary writ from an order of the Superior Court of Orange County, Nathan R. Scott, Judge.  Petition granted.

Hannemann Law Firm and Brian G. Hannemann; McNally Law Firm, Bryan L. McNally and Kathleen Doherty for Petitioner.

Littler Mendelson, Gregory Iskander and Renee C. Feldman for Real Party in Interest General Electric Company.

No appearance for Real Party in Interest Joseph P. Gorczyca, III.

In March 2022, President Joseph R. Biden signed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the Act) (9 U.S.C. §§ 401, 402), representing the first major amendment of the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) since its inception nearly 100 years ago. This legislation, having bipartisan support, voids predispute arbitration clauses in cases, such as the one before us now, involving sexual harassment allegations. We regret that this new legislation does not apply retroactively to Casandra Murrey's complaint filed in March 2021. Nevertheless, we will consider Murrey's writ petition because the highly secretive and one-sided provisions of her arbitration agreement make it both procedurally and substantively unconscionable. The agreement is factually distinguishable from existing case authority upholding employment adhesion contracts and exemplifies why the legislature drafted House Bill No. 4445. We conclude the trial court erred by enforcing an unconscionably void arbitration agreement.

FACTS

Murrey, a single, 46-year-old female, worked for General Electric Company (GE) as a product sales specialist for ultrasound equipment. According to her complaint, GE "is a multinational conglomerate" that in 2020 had a gross revenue of $79.6 billion and employed over 200,000 people. The complaint alleged GE hired Murrey in early 2018 and she was a "top performer."

In 2019, GE hired Joseph P. Gorczyca, III. In January 2020, he became Murrey's direct supervisor, and he engaged in continuous sexual harassment in the workplace with Murrey and others. Gorczyca apparently liked to talk about his sex life, sexual acts, and made unwanted sexual advances. During an organized team dinner, Murrey claimed Gorczyca groped her, and as she tried to walk away, Gorczyca stopped her and tricked her into eating THC-laced chocolate. She eventually reported the misconduct to GE and participated in a telephone interview with one of its human resources (HR) employees. She alleged GE "never properly completed an immediate

2

[n]or appropriate investigation or took any . . . corrective action. Instead, [GE] later informed [her] that Gorczyca was 'no longer with the company.'" Thereafter, GE "commenced an illegal pattern of retaliatory behavior against Murrey because [she] engage[ed] in protective activity" that included "denying appropriate support for [her] sales position" and refusing to promote her.

Murrey's complaint contained causes of action for unlawful harassment based on gender and sex, failure to prevent harassment, labor code violations, and retaliation for opposing discrimination and harassment. In addition to emotional distress, Murrey alleged she suffered substantial losses in earnings, bonuses, deferred compensation, and other employment benefits.

Eight months after Murrey filed the complaint, GE filed a motion to compel arbitration. In support of the motion, GE's lead HR specialist Michelle Thayer submitted a declaration explaining the company had an electronic onboarding system. GE sent all new hires a "welcome e-mail" to the new hire's personal e-mail address that contained a link to GE's electronic onboarding system/portal. GE's welcome e-mail also provided the new hire with a unique username and temporary password to access the onboarding portal via the link. Next, new hires were prompted to create a new personal password of their choosing. After selecting a new personal password, the new hire was directed to the "GE Hire home page," which contained several more links "to the tasks assigned to the new hire." Each document was assigned a separate task and the new hire signed employment-related agreements using his or her electronic signature.

Thayer explained one task was to review an electronic copy of a document titled "'SOLUTIONS: An Alternative Dispute Resolution Procedure'" (Solutions manual.) Another task was to review and electronically sign the "Acknowledgment Conditions of Employment" (Acknowledgement). Based on this process and GE's other security measures, Thayer concluded Murrey's electronic signature on the Acknowledgment was made by Murrey.

3

Thayer attached to her declaration a copy of the 29-page Solutions manual. The first page of this document explained: "Solutions provides The General Electric Company ('GE' or 'the Company') and Covered Employees a fair, quick and efficient process to resolve certain claims arising out of or related to their employment relationship with the Company. [¶] This Procedure is not a guarantee of employment . . . [,] however, [it] creates a binding obligation on Covered Employees and the Company for the resolution of employment disputes."

The Solutions manual offered the following summary of the procedures: "Solutions is a structured dispute resolution procedure that consists of two internal levels of review followed by, if necessary and applicable, outside mediation (Level III) and arbitration (Level IV). Levels III and IV apply only to Covered Claims, as defined herein. The levels of Solutions are in a logical sequence, and employees must complete each level of the process before proceeding to the next level."

The first two levels required the employee to meet with members of the management team, and without the assistance of counsel, to discuss the dispute. Level III (mediation), and Level IV (arbitration), mandated the employee use GE's designated dispute resolution organization (DRO) to resolve the dispute. For both mediation and arbitration, the employee could be represented by an attorney.

The Solutions manual explained: "At Level IV, an external arbitrator provides the employee and the Company with a binding decision on the merits of the Covered Claim(s). Both mediation and arbitration under Levels III and IV will be administered by a nationally recognized [DRO]. Employees may obtain information regarding which DRO has been designated to handle proceedings at Level III and IV and the DRO's rules governing such proceedings from the Solutions Administrator or the local HR manager." No information was provided on how to find or contact the Solutions administrator or the HR manager during the onboarding process. As will be discussed anon, the Solutions manual offered confusing definitions about whether

4

Solutions was the name of an independent agency providing dispute resolution administrative services, an entity affiliated with GE, or simply the name of an employee handbook.

Specific details regarding the arbitration process and procedures will be discussed in more detail in the analysis section of this opinion. Suffice it to say, the Solutions manual noted the DRO's rules "may be amended, without notice by the DRO" and some of those standardized rules were superseded by GE's "presumptive guidelines." GE's guidelines (over four pages of the Solutions manual) set forth specific procedures for all aspects of the arbitration proceedings, including initial disclosures, protective orders, discovery limits, timing of discovery, requirements for expert witnesses, discovery disputes, subpoenas, dispositive motions, pre-hearing motions, time restrictions on the hearing, location rules, the number of attendees, the use of evidence, the requirement of no more than five witnesses (including experts), the scope of the award and limits on the arbitrator's authority, and confidentiality of the decision. The discovery guidelines section incorporated multiple subparts restricting discovery to no more than 20 interrogatories, 15 requests for documents, 15 requests for admission, and 3 depositions. GE required the party requesting documents "shall bear the reasonable cost of compliance with the request . . . ." GE mandated that the arbitrator control the duration of the hearing "and shall seek to limit the length of the arbitration hearing to two 8-hour days (16 hours total)."

Thayer also attached a copy of the two-page Acknowledgment. The first line of this document told the new hire to read the contents as well as "the documents it references carefully." It noted the referenced documents could be reviewed on the eOffer website. The Acknowledgment stated the new hire's offer of employment was "contingent upon your acceptance of the conditions of employment described below." Among the long list of contingencies, paragraph 1(g) stated the new hire must agree to review and accept the dispute resolution procedures set forth in the Solutions manual.

5

GE argued there was a valid agreement to arbitrate Murrey's dispute. It added the FAA applied and Murrey's claims were covered by the agreement. Murrey opposed the motion, arguing the adhesion contract was procedurally and substantively unconscionable. She argued the unconscionable terms could not be severed to make the arbitration agreement enforceable. She submitted her declaration explaining how the agreement was presented to her as a new hire. "During the onboarding process . . . I was required to sign multiple documents within a short period of time. My hiring manager . . . informed me that my future employment with GE was contingent upon me signing all onboarding documents including a document entitled Solutions. When seeing all of the onboarding documents, including Solutions, I felt pressured to sign quickly. I did not understand the unfair and one-sided nature of GE's Solutions process."

The trial court granted the motion to compel arbitration. It reached the following conclusions: (1) GE met its burden of showing the arbitration agreement covered Murrey's claims; (2) All of Murrey's causes of action arose out of or were connected with her employment; (3) Murrey met her burden showing procedural unconscionability because it was a contract of adhesion; (4) "The omission of the arbitrator provider or its rules does not add much. [Citations.]"; and (5) Murrey failed to show a sufficient degree of substantive unconscionability to render the agreement unenforceable. The court explained, the agreement allowed for limited judicial review, permitted discovery, and authorized the arbitrator to award attorney fees to the prevailing plaintiff. It severed one "minor" offensive provision shifting discovery costs to the employee.

DISCUSSION

I. *Retroactivity of the Act*

The Act added two sections to the FAA. Section 401 of the Act defines several terms relevant to interpreting its scope. First, it defined the two types of covered agreements as follows: (1) predispute arbitration agreements are individual agreements

6

to arbitrate "a dispute that had not yet arisen at the time of making the agreement"; and (2) predispute joint-action waivers are agreements prohibiting a plaintiff from participating in a joint, class, or collective action in a judicial, arbitral, administrative, or other forum. (9 U.S.C. § 401, subds. (1) & (2).)

Section 402, subdivision (a), of the Act describes its applicability, stating that effective immediately, predispute arbitration agreements and joint-action waivers in the context of sexual assault or harassment were no longer valid or enforceable. "[A]t the election of the person alleging conduct constituting a sexual harassment dispute or sexual assault dispute, or the named representative of a class or in a collective action alleging such conduct, no predispute arbitration agreement or predispute joint-action waiver shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute." (9 U.S.C. § 402, subd. (a).)

The Act's language clearly establishes it was effective immediately. Section 402, subdivision (a), unambiguously provided the Act applied "with respect *to a case filed* under . . . State law and relates to the . . . sexual harassment dispute." (Italics added.) Although the Act applied to any cases filed after its enactment, there is some debate about whether it matters *when* the underlying sexual harassment or assault took place. One federal court has resolved this question in favor of employers, holding the dispute or claim must arise after March 3, 2022, the date of the Act's enactment. (*Steinberg v. Capgemini Am., Inc.* (E.D.Pa. Aug. 16, 2022, Civ. A. No. 22-489) 2022 U.S.Dist. Lexis 146014, p. *6.) The court reached this conclusion by relying on a marginal note to the Act which stated: "This Act, and the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act." (Pub.L. No. 117-90, § 3, reprinted in notes foll. 9 U.S.C. § 401.)

7

On the other hand, one treatise proposes that because this marginal note is not included in the Act, it should be interpreted "as merely clarifying that the Act is inapplicable to claims already filed in arbitration." (Laura Farley, *Ending Forced Arbitration: Understanding the New Federal Law That Prohibits Mandatory Arbitration in Matters of Sexual Assault or Harassment* (2022) 79 Bench & B. Minn. 26, 29.) "Giving any further weight to this marginal note yields results that are unintelligible and contrary to the purpose of this legislative effort. It is illogical to interpret the Act to conclude that Congress intended that someone sexually assaulted at work on March 2, 2022, would be forced to bring their claim in arbitration, whereas someone sexually assaulted the next day could pursue their claims in court." (*Ibid.*)

While these arguments are thought-provoking, we need not consider the issue because Murrey filed her case approximately one year before the Act was enacted. "During debate, Congress clarified that the Act is retroactive 'as to contracts currently signed,' but not to 'cases currently pending.'" (Farley, *supra,* at 29.) In other words, the Act is only applicable to cases filed after its enactment.

II. *Enforceability of the Arbitration Agreement*

"Article I, section 16 of the California Constitution provides: 'Trial by jury is an inviolate right and shall be secured to all . . . . In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute.' '"The jury as a fact-finding body occupies so firm and important a place in our system of jurisprudence that any interference with its function in this respect must be examined with the utmost care."' [Citations.] '"The denial of a trial by jury to one constitutionally entitled thereto constitutes a miscarriage of justice and requires a reversal of the judgment."' [Citation.]" (*Mackovska v. Viewcrest Road Properties LLC* (2019) 40 Cal.App.5th 1, 9; *Hodge v. Superior Court* (2006) 145 Cal.App.4th 278, 283 ["A jury trial is an important constitutional right that should be '"zealously guarded by the courts"'"].) "In other contexts, courts have established rules of construction against waiver of this important

8

right.  (*Rodriguez v. Superior Court* (2009) 176 Cal.App.4th 1461, 1467 [citation] ["'[T]he right to trial by jury is considered so fundamental that ambiguity in [a] statute permitting such waivers must be 'resolved in favor of according to a litigant a jury trial''"]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 804 [citation] ['Where it is doubtful whether a party has waived his or her constitutionally-protected right to a jury trial, the question should be resolved in favor of preserving that right'].)"  (*Pillar Project AG v. Payward Ventures, Inc.* (2021) 64 Cal.App.5th 671, 680.)

Predispute arbitration agreements are specifically authorized by statute. (Code Civ. Proc., § 1281 ["A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract"].)[1]  Contracting parties can voluntarily agree to waive their constitutional right to have their dispute resolved in a judicial forum by a jury.  However, courts asked to compel arbitration must keep in mind that arbitration is "a voluntary means of resolving disputes, and this voluntariness has been its bedrock justification."  (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 115 (*Armendariz*).)  The right to arbitration depends on the enforceability of the party's contract.  Policies favoring the efficiency of private arbitration "'must sometimes yield to its fundamentally contractual nature'" and "we must be particularly attuned to claims that employers with superior bargaining power have imposed one-sided, substantively unconscionable terms" to an adhesive preemployment arbitration contract.  (*Ibid.*)  Private arbitration must not become "'an instrument of injustice imposed on a "take it or leave it" basis.'"  (*Ibid.*)

"As a starting point for our analysis, we review general principles of unconscionability.  '"One common formulation of unconscionability is that it refers to '"an absence of meaningful choice on the part of one of the parties together with contract

---

[1]  All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

9

terms which are unreasonably favorable to the other party.'"  [Citation.]  As that formulation implicitly recognizes, the doctrine of unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results.'"  [Citation.]"  (*Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, 1243 (*Baltazar*).)

"""The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." [Citation.]  But they need not be present in the same degree.  "Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." [Citations.]  In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' [Citation.]"  (*Baltazar, supra,* 62 Cal.4th at pp. 1243-1244.)

"'[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided.  [Citation.] . . . [T]here are degrees of procedural unconscionability. . . .  Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced [citation], contain a degree of procedural unconscionability even without any notable surprises, and "bear within them the clear danger of oppression and overreaching." [Citation.]' [Citation.]  We have instructed that courts must be 'particularly attuned' to this danger in the employment setting, where 'economic pressure exerted by employers on all but the most sought-after employees may be particularly acute.' [Citation.]"  (*Baltazar, supra,* 62 Cal.4th at p. 1244.)

"'The unconscionability doctrine ensures that contracts, particularly contracts of adhesion, do not impose terms that have been variously described as ""'overly harsh"'" [citation], "'unduly oppressive'" [citation], "'so one-sided as to "shock the conscience"'" [citation], or "unfairly one-sided" [citation]. All of these formulations point to the central idea that the unconscionability doctrine is concerned not with "a simple old-fashioned bad bargain" [citation], but with terms that are "unreasonably favorable to the more powerful party" [citation]. These include "terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms, or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction." [Citation.]' [Citation.]" (*Baltazar, supra,* 62 Cal.4th at pp. 1244-1245.)

A. *Procedural Unconscionability*

The court concluded, and the parties do not dispute, Murrey's arbitration agreement was procedurally unconscionable because it was offered on a take-it-or-leave-it basis. The unmodifiable electronic document was a contract of adhesion. Murrey's employment onboarding experience presented a higher degree of oppressiveness than other situations where a new hire is provided copies of the agreement and given ample time to review the documents, ask questions about the terms, or request a modification. Murrey declared she had a short period of time to click boxes on her computer and electronically sign forms acknowledging she received multiple lengthy documents. GE did not present evidence refuting this claim, and the trial court overruled its objection to this part of Murrey's declaration.

11

1. *Secretive DRO and Arbitration Rules*

Murrey argues there was a greater degree of procedural unconscionability in her case because GE did not provide her with a copy of the DRO's arbitration rules, which, according to the Solutions manual, governed any arbitration proceedings between the parties. This omission, however, was but one small piece of a much larger secrecy problem. GE also did not disclose the name of the arbitration provider or the location of the proceedings. The amount of information withheld from Murrey in this case is what sets it apart from those where a copy of the American Arbitration Association's (AAA) rules, or the Judicial Arbitration and Mediation Service's (JAMS) rules, were omitted and simply incorporated by reference.

As noted by our Supreme Court in *Baltazar,* "'[N]umerous cases have held that the failure to provide a copy of the arbitration rules to which the employee would be bound supported a finding of procedural unconscionability.' [Citation.] But in [those cases] . . . the plaintiff's unconscionability claim depended in some manner on the arbitration rules in question. [Citations.] These cases thus stand for the proposition that courts will more closely scrutinize the substantive unconscionability of terms that were 'artfully hidden' by the simple expedient of incorporating them by reference rather than including them in or attaching them to the arbitration agreement. [Citation.]" (*Baltazar, supra,* 62 Cal.4th at p. 1246.)

In the *Baltazar* case*,* the employer did not provide their new hire with a copy of the AAA's rules for arbitration but incorporated them by reference. (*Baltazar, supra,* 62 Cal.4th at p. 1246.) The court determined the employee's argument "might have force if her unconscionability challenge concerned some element of the AAA rules of which she had been unaware when she signed the arbitration agreement" but her claim had nothing to do with the fairness of the AAA rules. (*Ibid.*) Accordingly, the court determined the employer's failure to attach the AAA rules would not "affect [the court's] consideration of [the employee's] claims of substantive unconscionability." (*Ibid.*)

12

More recently, an appellate court determined a plaintiff failed to show a heightened degree of procedural unconscionability "with regard to the agreement's non-identification of a specific arbitration provider or the version of the arbitral rules that would apply in a given dispute." (*Davis v. Kozak* (2020) 53 Cal.App.5th 897, 910 (*Davis*).) However, that case is distinguishable on the key point that the agreement designated AAA as the default arbitration provider and referred to the applicable rules as being those the arbitration service agreed upon. (*Id.* at p. 904.) The defendant argued there was no potential for surprise because in the event the parties disagreed on an arbitrator, plaintiffs understood the AAA rules would apply. (*Id.* at p. 908.) The court held the unconscionability for failure to identify the correct version of the AAA rules depended "in some manner on the substantive unfairness of a term or terms" contained in those variations. (*Id.* at p. 909.) In that case, plaintiff did "not contend that either the 2002 or the 2009 version of the AAA employment rules contained substantively unconscionable terms." (*Ibid.*)

The *Davis* court noted the case was distinguishable from *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 244, where the plaintiff was asked to sign the agreement during her interview, and the employer's representative admitted he did not know which AAA rules applied. The court in *Davis* deemed it significant that the plaintiff did not claim he was given insufficient time to consider the agreement or was "otherwise unable to access the AAA rules at the time of contracting." (*Davis, supra,* 53 Cal.App.5th at p. 909.)

Our case differs from *Baltazar* and *Davis.* GE's agreement (1) failed to identify the DRO provider it selected for Murrey's work location, (2) failed to designate a fallback set of accepted rules if the DRO changed, (3) failed to designate a location for the arbitration; (4) failed to explain whether it knew at the time of contracting which version of rules were applicable, and (5) failed to prove GE gave Murrey sufficient time to consider the Solutions manual, inquire about the DRO, and access the arbitration rules

13

at the time of contracting. We conclude Murrey showed a heightened degree of procedural unconscionability beyond the agreement's adhesive nature.

GE argues the arbitration agreement did not keep secret the name of the arbitration provider or the rules because the Solutions manual stated the employee "simply had to ask either the Solutions Administrator or her local HR manager" for this information. It points to page nine of the Solutions manual, which stated the following: "For each location covered by Solutions, the Company has designated a DRO which shall handle any and all [arbitrations] for employees based in such location. Employees may obtain information regarding the DRO designated to handle their Covered Claims, including the name and location of the DRO and the DRO's current rules of procedure, from the Solutions Administrator, or the local HR manager. Except as provided otherwise by this Procedure, the mediation and arbitration . . . will be administered by the designated DRO under its current rules for mediation and for arbitration, as may be amended, without notice by the DRO."

This provision does not persuade us that either the DRO's name or applicable rules were disclosed to Murrey (or were known to GE at the time of contracting). The agreement does not specify *how or when* the DRO would be selected, but clearly provides this decision belonged solely to GE. As a result, GE had the option of selecting a different DRO for each location and finding companies most beneficial for resolving a particular type of dispute. This provision also conferred a unilateral right to change the DRO for any particular location without notice and for its benefit. Thus, we have no reason to assume a new hire would be able to find the contact information for the Solutions Administrator at her future location or her "local HR manager." GE did not present evidence showing this contact information was available during Murrey's electronic onboarding process or that she was given the time to ask about the DRO's name or applicable rules. As aptly stated by Murrey in her briefing, GE's "scheme epitomizes the very definition of secrecy."

14

Most of GE's briefing is premised on the factual assertion AAA was its designated arbitration provider for Murrey's location. It discusses a large body of legal authority upholding agreements incorporating by reference AAA or JAMS rules. (*Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 180 [agreement told plaintiff she could obtain arbitration rules from HR department or "'directly from'" the AAA]; *Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, 691-692 [failure to attach copy of AAA rules did not render agreement unconscionable, especially when agreement specified "a particular set of AAA rules, and it did not modify those rules in any manner"]; *Peng v. First Republic Bank* (2013) 219 Cal.App.4th 1462, 1472 [Because plaintiff "did not identify any feature of the AAA rules that prevent fair and full arbitration" the failure to attach the AAA rules, standing alone, is insufficient grounds for procedural unconscionability]; *Bigler v. Harker School* (2013) 213 Cal.App.4th 727, 737 ["absence of the AAA rules is of minor significance to our analysis"].)[2] GE also submitted a seven-page table demonstrating how many of GE's rules sounded similar to AAA's generally accepted rules. However, the factual premise of all these contentions lacks evidentiary support. We found no evidence showing GE verbally disclosed to Murrey that AAA was its designated DRO, or that GE included this information in any of the onboarding electronic documents. How was Murrey to know GE designated AAA when she signed the contract?

---

[2]     GE does not cite to any cases where the agreement failed to state the name of the designated DRO and *also failed* to mention or incorporate default DRO rules. We note GE cited two unpublished federal cases that we considered. California Rules of Court, rule 8.1115 generally does not permit citation of unpublished California cases, but it does not prohibit citation of unpublished federal cases. (Cal. Rules of Court, rule 8.1115; *Moss v. Kroner* (2011) 197 Cal.App.4th 860, 875, fn. 6.) Both federal cases are distinguishable because AAA or JAMS rules were specifically referenced in the arbitration agreements. (*Asher v. E! Entm't TV, LLC,* (C.D.Cal., Aug. 16, 2017, CV 16–8919–RSWL–SSx) 2017 U.S.Dist. Lexis 131579, pp. *7-*9 (*Asher*) [JAMS]; *Sullenberger v. Titan Health Corp.* (E.D.Cal., May 20, 2009, CIV-S-08-2285 LKK GGH) 22009 U.S.Dist. Lexis 46586, pp. *22-*25 [AAA].)

The only reference in the record identifying AAA as the DRO was in GE's litigation counsel's declaration submitted in support of the motion to compel arbitration. She simply declared: "GE designated and utilizes the [AAA] as the 'nationally recognized [DRO]' referenced in its GE's Solutions procedure." She supplied an electronic link to the most recent version of AAA's "employment rules."

Counsel failed to provide any insight into GE's DRO selection process or confirm GE designated AAA *before* Murrey filed her lawsuit. GE had dozens of arbitration agencies to choose from, and we have no reason to assume it had already picked AAA when Murrey signed the contract. We find it telling that GE did not explain why this information could not have been disclosed during Murrey's onboarding process, along with her personalized passwords, usernames, and various electronic documents.[3] GE's counsel offered no justification for keeping the name of the designated DRO or the

---

[3] Ironically, GE directed our attention to an unpublished federal district case where an entertainment industry executive "agreed to be bound by 'Solutions,' NBCUniversal Media's alternative dispute resolution ('ADR') program . . . ." (*Asher, supra,* 2017 U.S.Dist. Lexis 131579, at p. *2.) Unlike the case before us, the executive in *Asher* was represented by counsel when she negotiated her employment contract, and the company's "Solutions" procedures specified arbitration was to be "facilitated by JAMS, the designated [DRO]" (*Id.* at p. *3.) The court was not concerned the employer "did not attach the JAMS rules and required plaintiff to independently seek them out." (*Id.* at p.*8.) It reasoned that "[u]nder 'Summary of the Solutions Procedure,' employees may ask the Solutions Administrator or the local HR manager" for this information. (*Ibid.*) The court noted the Solutions administrator "was the representative *present"* when plaintiff and her attorney negotiated and signed the agreement and they had ample opportunity to ask him "about the DRO and the governing arbitration rules at that time." (*Id.* at p. *9, italics added.) In addition, there was evidence plaintiff signed employment agreements twice in prior years and she had no issue with the lack of attached JAMS rules. (*Ibid.*)

This case highlights how other companies using "Solutions" managed to also disclose the designated DRO and named the applicable rules. GE clearly took advantage of its superior bargaining position and kept Murrey in the dark about the rules applying to her forced arbitration.

DRO's rules hidden from new hires. We suspect the information was kept secret to give GE the upper hand in selecting a favorable DRO.

In light of all of the above, we conclude case authority validating an arbitration agreement incorporating AAA/JAMS rules is inapplicable here. GE did not identify an arbitration provider, and its incorporation of an unnamed DRO's rules are meaningless, particularly when GE had the option of changing the DRO at any time. Unlike the cases incorporating standardized AAA/JAMS rules, we cannot say with any certainty the incorporated rules would not be surprising or oppressive in some way.[4] While AAA/JAMS rules are generally accepted as fair (even if difficult for the employee to find), we found no authority upholding an agreement concealing *both* the rules and the name of the arbitration provider. Moreover, we question the relevance of case authority written when there were only two or three nationally recognized arbitration providers available. Currently, there are numerous international, national, and state-based arbitration providers, each offering different sets of rules and advertising different specialties.[5] For this reason, agreements giving only one party the authority to select the DRO must be considered a substantively material term of the contract.

Here, Murrey's preemployment adhesion contract granted her employer the sole right to select, and also keep secret, the name of the DRO (and applicable rules). "Given the lack of choice and the potential disadvantages that even a fair arbitration

---

[4] As mentioned, the Solutions manual gave GE the luxury of time in selecting an appropriate arbitration provider. Solutions Levels I and II required an employee to submit her claims and engage in confidential proceedings with her workplace manager and without legal representation. This process let GE determine the exact nature of an employee's dispute long before the case could progress to arbitration.

[5] AAA and JAMS are not the only DRO options. For example, the American Bar Association lists 21 different nationally recognized DROs and many others. (See American Bar Association, ADR Organizations <https://www.americanbar.org/groups/dispute_resolution/resources/adr-organizations/, [as of Jan. 30, 2023], archived at: <https://perma.cc/H6B9-GQQK>.)

system can harbor for employees" (*Armendariz, supra,* 24 Cal.4th at p. 115), we conclude this particular provision was highly unconscionable.

This conclusion also explains why the trial court's reliance on *HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100 (*Amini*), was misplaced. In that case, the arbitration clause gave the parties three choices on how to jointly select an arbitrator "'for arbitration in accordance with the applicable United States Arbitration and Mediation Rules of Arbitration.'" (*Id.* at p. 1104, italics omitted.) The court rejected the plaintiffs' argument the agreement needed to identify a single method for selecting an arbitrator to be valid. (*Id.* at p. 1107.) It explained section 1281.6 provided that if the method of picking an arbitrator was not stated in the agreement, the parties could agree on a method of selection, or the court will appoint an arbitrator. (*Amini, supra,* 219 Cal.App.4th at pp. 1107-1108.)

While this case supports GE's legal theory that the absence of an arbitration provider in the agreement does not render an agreement unconscionable, it does not support upholding the agreement in the case before us. GE's agreement specified a single method for selecting an arbitration service: GE had the sole authority to designate a preferred DRO for each of its locations. GE's decision to keep the identity of the predesignated DRO concealed from Murrey, while at the same time forcing her to arbitrate her dispute, could not be remedied by section 1281.6.

2. *Confusion About Applicable Rules*

Another feature distinguishing this case from many others is the uncertainty and confusion created by GE's decision to incorporate its own set of arbitration rules, in addition to incorporating the hidden DRO's rules, while at the same time authorizing the arbitrators to expand or limit GE's set of rules. If we assume for the sake of argument Murrey somehow could have learned the DRO rules mentioned in the Solutions manual referred to AAA rules (during the onboarding process), we conclude the agreement was

still unconscionable. The agreement's unclear, incomplete, and contradictory language would fail to inform any reasonable person of the contract's consequences.

We asked the parties to include in their briefing a discussion about whether the agreement provided GE's presumptive guidelines superseded the unnamed DRO's rules, and if so, what showing would be required to overcome the presumptive use of the guidelines. Their responses clearly exemplify why Murrey had no chance of understanding the terms of GE's forced arbitration.

GE asserts its guidelines did not supersede the DRO's rules and directs our attention to several provisions it believed proved the agreement authorized the arbitrator to decide what procedural and discovery rules would apply. First, it cited to the Solutions manual's section II, paragraph P (on p. 9), titled, "Rules of Administration for Mediation and Arbitration." This provision repeated GE had designated "a DRO" for arbitration and the employee could asked about the "name and location of the DRO and the DRO's current rules of procedure, from the Solutions Administrator, or the local HR manager." The last sentence of the paragraph stated: "Except as provided otherwise by this Procedure, the . . . arbitration of Covered Claims will be administered by the designated DRO under *its current rules* for . . . arbitration, as may be amended, without notice by the DRO." (Italics added.) GE noted there was nothing in this paragraph requiring the arbitrator to follow GE's presumptive guidelines "over that of the AAA's rules."

GE also focused on a provision found seven pages later (on p. 16 of the Solutions manual, section III, paragraph D, subsection 1, hereafter section III(D)(1)).[6] GE asserted that provision gave the arbitrator authority "to make reasonable alterations" to the guidelines. Based on its reading of these two provisions, GE concluded the agreement clearly let the arbitrator decide what rules applied, and therefore, it cannot be

---

[6] For ease of reading, all future references to the Solutions manual will be abbreviated in a similar manner.

19

said GE's guidelines *superseded* the incorporated AAA rules. In essence, GE is arguing one set of rules did not supersede the second set because the arbitrator could modify both sets. This convoluted assertion does not help convince us the agreement fairly and completely informed Murrey about the consequences of forced arbitration. The processes and rules should be clear, conspicuous, and understandable so that there are no surprises.

Moreover, as Murrey aptly pointed out in her briefing, GE's argument ignores the first part of the sentence in section II(P) of the Solutions manual, which stated, "Except as provided otherwise by this Procedure." This language serves to qualify the rest of the paragraph stating the DRO rules apply. The phrase "[e]xcept as provided otherwise" plainly refers to 23 separate sections of text found on pages 16 through 23. Confusingly, some of these sections permit the arbitrator to consider altering GE's guidelines rather than falling back on the DRO's rules. For example, the Solutions manual provided that an arbitrator may increase or decrease the amount of discovery permitted (section III(D)(6)), and "modify" the discovery guidelines "in consideration of the interests of simplicity and expedition of arbitration balanced against the value of the information in establishing a claim or defense" (section III(D)(6)(c)). Neither of these provisions require the arbitrator to abandon the guidelines in favor of the DRO's rules. To the contrary, it appears that an arbitrator's only choices are to accept or modify the presumed guidelines. These provisions support the conclusion GE's set of rules superseded the DRO rules.

The only section we found that required the arbitrator to follow the DRO's rules was section III(D)(6)(viii) of the Solutions manual, which provided, "the arbitrator shall have the authority to resolve any . . . disputes pursuant to the Rules of the DRO." Thus, the DRO rules supersede all other rules for discovery disputes. But because GE did not disclose the DRO, there was no way of knowing if the discovery dispute rules used by the unnamed DRO are fair.

20

GE called its arbitration rules "presumptive guidelines" rather than simply "guidelines" or "rules." Section III(D)(1)'s description of the guidelines only hint at why they are presumptive. It provided as follows: "The Procedures below contain certain guidelines on discovery and witnesses in an effort to further the interests of simplicity and expedition of arbitration. *These guidelines will apply* unless the arbitrator determines that they will prevent the party from obtaining information and/or presenting evidence that will assist the party in proving a claim or defense, in which case the arbitrator shall have authority to make reasonable alterations to such guidelines." (Italics added.) The Solutions manual does not explain how a party could rebut the presumed use of GE's guidelines in favor of less restrictive discovery.[7]

Two cases are instructive on this point. In *Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 720 (*Fitz*), the court rejected an employer's assertion that although the agreement listed rules impermissibly denying fair discovery the agreement also incorporated AAA rules that would ensure adequate discovery. The *Fitz* court determined the two sets of rules were materially inconsistent and the employer could not belatedly claim it intended the AAA rules to apply. (*Id.* at p. 721.) The court noted the potential conflict created the possibility of legal battles and additional expense litigating rule disputes. (*Ibid.*) Additionally, "there is also the very real potential for disparate enforcement of the [employer's employee-dispute resolution] policy terms, since arbitrators may disagree on whether the policy's limits on discovery are materially inconsistent with AAA rules." (*Ibid.*) "[The employer] deliberately replaced the AAA's

---

[7] It is interesting to note the Committee on the Judiciary in its report supporting the new Act concluded "Forced arbitration . . . lacks many procedural safeguards of the justice system." (H.R.Rep. No. 117-234, 2d Sess., p. 5. (2022) (House Report).) It focused on evidence and testimony showing "the company imposing arbitration often selects the . . . arbitration provider creating a conflict of interest in which the purportedly neutral arbitrator may be motivated by the prospect of obtaining repeat business from the company rather that the desire to fairly assess the claim." (House Report, *supra*, at p 5, fns. omitted.)

21

discovery provision with a more restrictive one, and in so doing failed to ensure that employees are entitled to discovery sufficient to adequately arbitrate their claims. [The employer] should not be relieved of the effect of an unlawful provision it inserted in the [employee-resolution] policy due to the serendipity that the AAA rules provide otherwise. [Citation.]" (*Ibid.*)

In *Harper v. Ultimo* (2003) 113 Cal.App.4th 1402 (*Harper*), the court reviewed a work contract that contained an arbitration provision incorporating the arbitration rules of the Better Business Bureau (BBB). The court refused to enforce the arbitration clause because the hidden BBB rules had a negative substantive impact on the plaintiff's claims. The surprise element of hiding the BBE rules was obvious: "Here is the surprise: The customer must inevitably receive a nasty shock when he or she discovers that *no relief is available* even if out and out fraud has been perpetrated, or even if he or she merely wants to be fully compensated for damaged property." (*Id.* at p. 1406, italics added.) "Here is the oppression: The inability to receive full relief is artfully hidden by merely referencing the [BBB] arbitration rules, and not attaching those rules to the contract for the customer to review. The customer is forced to go to another source to find out the full import of what he or she is about to sign—and must go to that effort *prior* to signing." (*Ibid.*) Importantly, the court noted that the arbitration rules of the BBB "are not just *procedural* ones . . . . By limiting the scope of arbitral claims, the [BBB] rules have the effect of *substantively* limiting the defendant's exposure." (*Id.* at p. 1407.)

In the present case, Murrey cannot say if the rules GE failed to include with the other electronic onboarding documents were unfairly one-sided because GE also kept secret the name of the DRO generating those rules. There is a growing list of DROs offering dispute resolution services, and we need not speculate that GE would have picked one with rules generally accepted by case authority (like AAA or JAMS). The court in *Harper* stated it was unacceptable for an arbitration agreement not to indicate

whether the arbitration would be conducted under the BBB's rules as of the time of contracting or at the time of arbitration. (*Harper, supra,* 113 Cal.App.4th at p. 1407.) It stated, "Thus even a customer who takes the trouble to check the [BBB] arbitration rules before signing the contract may be in for a preliminary legal battle in the event that [BBB] arbitration rules were to become substantively less favorable in the interim. Before the main battle commenced in arbitration, there would be a preliminary fight over which set of arbitration rules governed—something which, at the very least, would add to the customer's legal expense. [Citation.]" (*Ibid.*) Similarly, GE's Solutions manual did not say what version of the undisclosed DRO's rules would apply, but ominously stated the DRO rules could change at any time. What if the undisclosed rules were to become less favorable over time?

When an arbitration agreement, such as the one before us, has multiple elements of procedural unconscionability, usually the next step is to closely "'scrutinize the substantive terms . . . to ensure they are not manifestly unfair or one-sided.'" (*Baltazar, supra*, 62 Cal.4th at p. 1244.) Compounding the obvious problems created by the Solutions manual claiming to follow two sets of rules was GE's decision to only identify one of them. We have no reason to conclude the missing set of rules was acceptable.

3. *Location of Arbitration*

On page 20 of the Solutions manual, section III(D)(12) stated the following information about the place of the arbitration hearing: "Unless the parties agree otherwise, or the arbitrator directs otherwise, the parties shall use the DRO office nearest to the employee's work location to arbitrate the Covered Claims. If the DRO's office is unavailable, the DRO will arrange for the rental of an arbitration hearing room that is mutually convenient." This provision is a complicated way of saying the location of your arbitration will be a surprise.

23

In *Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, plaintiff borrowers were not given a copy of the arbitration rules, but the court did not rely on this fact when concluding the agreement was procedurally unconscionable. The court determined the arbitration agreement was invalid because (1) it was an adhesion contract, (2) the arbitration rules were unclear as to the hearing's location, (3) California consumers would not expect that arbitration would take place in Minnesota, and (4) the likely result of the procedures was to deny California consumers a "participatory hearing." (*Id*. at pp. 1664-1666.)

GE's rules do not suggest an out-of-state venue but vaguely promise to select the *nearest available* venue suitable to an unidentified DRO. Thus, there was no guarantee the arbitration would be close to Murrey's home or workplace. Forced arbitration at a location in Northern California for an employee living in Southern California would be unreasonable, and unanticipated. "Substantive unconscionability may be shown if the disputed contract provision falls outside the nondrafting party's reasonable expectations. [Citation.]" (*Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1573.)

We acknowledge this provision may have been reasonable if GE had designated a specific DRO with offices near Murrey's workplace. Alternatively, GE could have drafted more specific terms guaranteeing the location would not unfairly burden the employee, such as including a default maximum distance from the employee's workplace or home. As written, the potential for a surprisingly harsh term heightens the level of procedural unconscionability of the agreement.

B. *Substantive Unconscionability*

The legal term substantive unconscionability focuses on overly harsh or one-sided results. (*Armendariz, supra,* 24 Cal.4th at p. 114.) In evaluating substantive unconscionability, courts often look to whether the arbitration agreement meets certain minimum levels of fairness. In *Armendariz*, our Supreme Court instructed that, at a

24

minimum, a mandatory employment arbitration agreement must (1) provide for neutral arbitrators, (2) provide for more than minimal discovery, (3) require a written award that permits limited judicial review, (4) provide for all of the types of relief that would otherwise be available in court, and (5) require the employer to pay the arbitrator's fees and all costs unique to arbitration.  (*Id.* at pp. 102-103.)  "Elimination of or interference with any of these basic provisions makes an arbitration agreement substantively unconscionable."  (*Wherry v. Award, Inc.* (2011) 192 Cal.App.4th 1242, 1248.)

### 1.  *Requiring Murrey to Pay Costs Unique to Arbitration*

The Solutions manual, section III(D)(6)(c)(ii), required each party to bear the "reasonable cost of compliance" with discovery requests.  The court severed this provision as "imposing an obligation beyond the Discovery Act."  (See *Armendariz, supra,* 24 Cal.4th at p. 113 [required an employer to pay "all types of costs that are unique to arbitration"].)  In its briefing, GE does not dispute this provision was substantively unconscionable.

### 2.  *Default Discovery Limitations*

Our Supreme Court held a mandatory employment arbitration agreement must provide for more than minimal discovery.  (*Armendariz, supra,* 24 Cal.4th at p. 102.)  Employees "are at least entitled to discovery sufficient to adequately arbitrate their statutory claim, including access to essential documents and witnesses."  (*Id.* at p. 106.) Parties can agree to limitations on discovery, but an arbitration agreement must "'"ensure minimum standards of fairness" so employees can vindicate their public rights.'"  (*Baxter v. Genworth North America Corp.* (2017) 16 Cal.App.5th 713, 727 (*Baxter*).)

GE's presumptive guidelines set default limitations on discovery.  In advance of the Level I meeting, and by request to the Solutions administrator, an employee could access documents from his or her personnel and medical files in GE's possession.  However, an employee was not entitled to engage in the discovery process

25

until reaching the arbitration level of Solutions. Of course, by this time GE had three stages of dispute resolution proceedings to gain a full understanding of the employee's evidence and all aspects of his or her complaints.

The Solutions manual's default discovery provisions limited each party to three depositions and "20 separately numbered interrogatories . . . [s]ubparts to interrogatories will count as separate interrogatories." In addition, each party was restricted to 15 requests for documents and 15 requests for admissions. The agreement called for an abbreviated discovery exchange schedule by mandating "the arbitration hearing to occur no later than 180 calendar days after the appointment of the arbitrator."

While superficially neutral, these discovery restrictions only favor GE. "Employment disputes are factually complex, and their outcomes 'are often determined by the testimony of multiple percipient witnesses, as well as written information about the disputed employment practice.' [Citation.] Seemingly neutral limitations on discovery in employment disputes may be nonmutual in effect. '"This is because the employer already has in its possession many of the documents relevant to an employment discrimination case as well as having in its employ many of the relevant witnesses."' [Citation.]" (*Baxter, supra,* 16 Cal.App.5th at pp. 727-728 [holding "default limitations on discovery are almost certainly inadequate to permit [the employee] to fairly pursue her claims"].)

GE does not defend its rules limiting discovery. Instead, it asserts the agreement can be upheld because the rules allowed the arbitrator to expand or limit discovery.[8] True, Solutions gave the arbitrator the discretion to further restrict discovery, or order more, depending "on the facts of the particular claim" keeping in mind "the

---

[8] Alternatively, GE argues the agreement incorporated the AAA rules, which provided for adequate discovery. It cites to legal authority holding these rules are not unconscionable. We need not address this argument because GE did not prove the agreement incorporated any specific arbitration agency's rules.

expedited nature of arbitration" and what the arbitrator "considers necessary for a full and fair exploration of the issue." GE correctly points out that these are some of the same words used by the AAA's discovery rules, which have been upheld in multiple cases. But as discussed, GE did not simply incorporate by reference AAA's discovery rules or, more importantly, adopt *all relevant parts* of the AAA rules.

The AAA employment dispute discovery rules provides in full: "The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration." Thus, an AAA arbitrator is not required to start with the presumption three depositions and a handful of written discovery was what the parties bargained for. The AAA arbitrator is not told certain rules limiting discovery "will apply" unless the arbitrator finds a reason to modify them. An AAA arbitrator is permitted to following the broadly written AAA discovery rules without having to worry if those rules conflict with or were superseded by 23 paragraphs of confusing presumptive guidelines. Because GE borrowed some but not all of the language used by the AAA's discovery rules, the cases it cites upholding the AAA rules are inapt.[9]

Murrey explains the default discovery allowed by the terms of the agreement were low, placing on her a greater burden to justify the additional discovery

---

[9] The trial court concluded the Solutions manual's arbitration provisions were acceptable because GE permitted discovery subject to the arbitrator's discretion. The court cited to two cases holding courts must presume arbitrators will follow their company's rules. However, those cases both involved arbitration agreements incorporating AAA rules. In *Lane v. Francis Capital Management LLC* (2014) 224 Cal.App.4th 676, the court upheld an agreement containing no express provision for discovery because the agreement incorporated AAA rules. The court in *Roman v. Superior Court* (2009) 172 Cal.App.4th 1462, held AAA discovery rules satisfied the *Armendariz* discovery requirements. In contrast, here the Solutions manual incorporated an unidentified DRO's rules and confusingly required that the arbitrator follow a different set of guidelines regarding the arbitration proceedings.

she anticipated would be needed to successfully prove workplace sexual harassment and retaliation claims. She asserts the typical "'me too'" evidence will require multiple nonparty depositions and extensive law and motion. Murrey's complaint contains 10 complex causes of action requiring different types of documentary evidence related to GE's alleged workplace retaliatory tactics. We agree with Murrey, the default level of discovery provided for in the arbitration agreement appear to be inadequate to vindicate her rights.

We recognize there is case authority holding courts should assume an "arbitrator will operate in a reasonable manner in conformity with the law. [Citations.]" (*Dotson v. Amgen, Inc.* (2010) 181 Cal.App.4th 975, 984.) But under the circumstances presented here, it is reasonable to conclude certain terms of the arbitration agreement appear to constrain an arbitrator's ability to expand discovery by imposing confusing "presumptions" that favor limiting discovery. An arbitrator could reasonably infer he or she would need to overcome the "presumption" for using GE's designated rules and the Solutions manual does not clarify who has that burden of proof. Moreover, due to the mix of unclear and contradictory rules, Murrey will likely have to expend unnecessary time, effort, and money litigating discovery with GE because the governing procedures were confusing. For the above reasons, we conclude the discovery limitations in the agreement are substantively unconscionable.

3. *Other Unconscionable Provisions*

As part of our order to show cause, we asked the parties to address several issues in their briefing that were not raised by Murrey in the trial court. GE maintains that it is unfair for this court to consider additional unconscionability legal theories for the first time on appeal, and likewise we should not consider any additional legal issues

28

as part of our writ review.[10]  However, unlike the cases GE cited, our inquiry was limited to legal issues where there was no conflict in the extrinsic evidence presented below and GE was given a fair opportunity to consider and submit briefing.  "Whether an arbitration provision is unconscionable is ultimately a question of law.  [Citations.]" (*Higgins v. Superior Court* (2006) 140 Cal.App.4th 1238, 1250.)  Accordingly, we review a trial court determination of the validity of an agreement to arbitrate de novo.  (*Parada v. Superior Court* (2009) 176 Cal.App.4th 1554, 1567.)  We have discretion to consider new legal arguments on appeal that present a question of law to be applied to undisputed facts.  (*RN Solution, Inc. v. Catholic Healthcare West* (2008) 165 Cal.App.4th 1511, 1518.)

a.  *Unfairly Excluded Claims*

The Solutions manual section II(I) explained the parties were agreeing to arbitrate all claims arising from or related to employment, compensation, employment actions, claims of discrimination, whistleblowing, breach of contract, and tort claims. "Thus the agreement compels arbitration of the claims employees are most likely to bring" against his or her employer.  (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 176 (*Mercuro*).)  The Solutions manual section II(J) expressly excluded "[i]ntellectual property claims (for example, and without limitation, those relating to patents, trademarks and copyrights) . . . ."  Thus, the "agreement exempts from arbitration [a type of claim an employer] is most likely to bring against its employee." (*Ibid.*)

---

[10]  We note GE raised this contention in a footnote and only supplied this court with citations to appeals, not writ petitions.  Its legal analysis of this challenge was sparse.  Indeed, none the cases cited concerned the validity of an arbitration agreement or a court conducting a de novo review of a purely legal issue.  Moreover, unlike the cases cited by GE, the plaintiff in this case raised the legal issue of unconscionability below.  In conducting our de novo review, we discovered Murrey only scratched the surface. We would be remiss not to examine the full depth of the issue, particularly because we must also consider, de novo, if the unconscionability permeated the entire agreement.

"In *Armendariz*, the court observed substantive unconscionability may manifest itself if the form of 'an agreement requiring arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party.' This is what we have here: [The employer] requires the weaker parties — its employees — to arbitrate their most common claims while choosing to litigate in the courts its own claims against its employees." (*Mercuro, supra,* 96 Cal.App.4th at p. 176, fn. omitted.) The lack of mutuality as to arbitrable claims together with other one-sided terms discussed above, adds to this agreement's substantive unconscionability.

b. *Solutions' Dual Representation*

We asked the parties to brief whether Solutions' representation of both parties in arbitration proceedings created a conflict of interest. It was unclear whether Solutions was intended to be the name of an independent third-party entity providing dispute resolution administrative services or simply the name of GE's arbitration manual. For example, the first sentence of the manual stated, "Solutions provides [the parties] a fair, quick, and efficient process . . . ." This sentence implies Solutions, not GE, provides a process for GE's employees. What followed this sentence did not clarify matters. The next section, titled "Summary of the Solutions Procedure," explains employees are "encouraged to resolve issues informally" through discussions with GE management or HR, and if these internal efforts failed "an employee may submit his or her concern to Solutions." Thus, employees are advised to try resolving matters directly with GE before turning to Solutions, which could mean Solutions was something different from GE. Confusing matters further was that Solutions' protocols revisited the idea of having the employee meet with management for several internal levels of review. The Solutions manual does not explain how these meetings would differ from the ones initiated by the employee other than they would be scheduled and overseen by a Solutions administrator, again suggesting Solutions was an independent agency.

30

GE argues the Solutions administrator was nothing more than a liaison between GE and the DRO. This contention is not supported by the Solution administrator's job duties listed in the manual, which describe tasks beyond mere clerical work. Moreover, the Solutions manual repeatedly differentiates between the Solutions administrator and HR representatives working for GE (who presumably could also handle DRO clerical tasks). It is curious the Solutions manual does not include a job description for GE's HR employees also involved in dispute resolution.

The Solutions manual (section II(H)) provides that in addition to scheduling meetings between the parties, and recordkeeping, the Solutions administrator is responsible for "process[sing] requests for production of information." The act of *processing* could be broadly defined to include not only delivering but also having a hand in deciding what discovery will be disclosed. Another listed job duty was to coordinate "the receipt and processing of employees' claims with managers and with HR representatives." Again, designating the Solutions administrator as the party responsible for "processing claims" for the employee could commonly be understood as meaning representation of that party's interests. After all, Solutions forbids employees having their attorneys present at the meetings and hearings in Levels I through III. For the same reasons an attorney cannot concurrently represents two clients, there is an obvious conflict of interests if the Solutions administrator was offering more than clerical assistance for both parties. An employee reading the Solutions manual could easily be misled to conclude the Solutions administrator was there to play a greater role in all the required dispute resolution levels. It is unclear whether the Solutions administrator would be a neutral participant in all the proceedings.

c.  *Time Limit on Hearing and Limit on Witnesses*

GE's agreement limited arbitration to 16 hours (two days). To expedite matters, the agreement provides "neither party may call more than [five] witnesses, including expert witnesses, during the presentation of its case-in-chief."

Although not per se unconscionable, these restrictions clearly favor GE. Murrey's 10 causes of action are factually complicated and difficult to prove. Murrey will likely require more than two days to present her evidence. Case authority holds these kinds of provisions are not unconscionable because we should presume the arbitrator will extend the deadline or allow more witnesses if necessary. (*Baxter, supra,* 16 Cal.App.5th at pp. 735-736.) However, this is not a typical arbitration agreement. As discussed in our analysis of the discovery limits, GE incorporated two sets of rules into this agreement. Unlike AAA rules conferring broad discretion to arbitrators to afford the parties a full and fair hearing on the dispute, GE's presumptive guidelines superseded many of the DRO's rules. Due to the mix of confusing rules, it is highly foreseeable there will be delays and additional expenses while sorting out whether Murrey can have additional time and/or witnesses at the arbitration.

Moreover, the landscape of arbitration law is evolving. The Congressional Judicial Committee concluded there must be an end to forced arbitration of sexual harassment lawsuits: "[F]orced arbitration has transferred the rights of workers and consumers to a secretive, closed, and private system designed by corporate interests to evade oversight and accountability." (House Report, *supra*, at p. 6)

d. *Confidentiality*

Murrey was obligated to sign a strict confidentiality agreement regarding the required internal meetings with GE and mediation proceedings. The confidentiality clause regarding arbitration proceedings was less restrictive: Murrey was forced to agree she would not "publish or disseminate" the arbitration award. In case authority, our Supreme Court has determined a confidentiality provision in an arbitration agreement is not per se unconscionable when it is based on a legitimate commercial need (such as to protect trade secrets or proprietary information). (*Baltazar, supra,* 62 Cal.4th at p. 1250.) GE has not identified a commercial need for the proceedings to remain confidential. However, it cites to two appellate decisions holding there was nothing unreasonable or

prejudicial about a confidentiality provision "'with respect to the parties themselves.'" (*Sanchez v. Carmax Auto Superstores California, LLC* (2014) 224 Cal.App.4th 398, 408; *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723, 732 [rejecting a claim of public interest in open arbitration proceedings does not make a provision substantively unconscionable].)

We do not find these two cases persuasive in the context of a workplace sexual harassment complaint. The notion that courts should condone requirements keeping the outcome of forced arbitration proceedings confidential is out of step with federal and sister state case authority. The Ninth Circuit recognized that although confidentiality provisions are facially neutral, they usually favor companies over individuals. (See *Ting v. AT&T* (9th Cir. 2003) 319 F.3d 1126, 1151-1152 [discussing "'repeat player' effect" putting companies in a superior legal posture for future arbitration proceedings].) And as explained by the Supreme Court of Washington, "the effect of this confidentiality provision is harsh and blatantly benefits only [an employer] because it 'serves no purpose other than to tilt the scales of justice in favor of the employer by denying access to any information about other claims against the employer to other potential victims of discrimination.'" (*Zuver v. Airtouch Communications, Inc.* (2004) 153 Wash. 2d 293, 313-314 [103 P.3d 753, 765] (*Zuver*).)

Recently, the United States Congress held two lengthy hearings in 2021 and listened to compelling testimony by numerous sexual harassment/assault victims. (House Report, *supra*, at pp. 11-12) Although the Act is not applicable to this case, each victim's testimony tangibly illustrated the negative impact of confidentiality clauses. The secretive nature of arbitration blocked their ability to seek justice and shielded the misconduct of employers. "Unlike the judicial system — in which courts' decisions are generally public and, by building on precedent, cumulative create a body of law — the results of arbitration disputes are often kept secret. . . . [A] coalition of state attorneys general — representing all 50 states, the District of Columbia and several U.S.

33

territories – have . . . noted arbitration's required 'veil of secrecy' applies to workplace sexual harassment claims, which may prevent similarly situated persons from learning of illegal conduct and seeking relief. The coalition referred to this phenomenon as a 'culture of silence that protects perpetrators at the cost of their victims.'" (House Report, *supra*, at pp. 5-4, fns. omitted.) Congress and President Biden were convinced the Act was necessary due to growing evidence the secretive nature of arbitration was fostering "the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers." (House Report, *supra*, p. 4.)

GE's confidentiality provision serves no purpose other than to benefit GE. Future employees cannot take advantage of findings in past arbitrations or prove a pattern of discrimination and/or retaliation. Solutions expressly provides an arbitrator cannot include in the award any requirement that GE change or revise its policies, procedures, rules and/or practices. In addition, "keeping past findings secret undermines an employee's confidence in the fairness and honesty of the arbitration process and thus potentially discourages that employee from pursuing a valid discrimination claim." (*Zuver, supra,* 153 Wash. 2d at pp. 313-314.) Therefore, we hold that this confidentiality provision added to this agreement's substantively unconscionability.

III. *Severance Question*

GE argues that if this court finds any provision is unconscionable the agreement should be enforced without that provision. It cites to several cases holding an agreement is not necessarily permeated by unconscionability or illegality if more than one clause is unconscionable. It points to some federal cases supporting the severability of three or more unconscionable provisions. (*Turng v. Guaranteed Rate, Inc.* (N.D.Cal. 2019) 371 F.Supp.3d 610, 633.) There is no magic number of unconscionable provisions that will preclude a court from deeming the entire agreement unenforceable. "If the

34

central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate." (*Armendariz, supra*, 24 Cal.4th at p. 124.)

"'"'"Whether a contract is entire or separable depends upon its language and subject matter, and this question is one of construction to be determined by the court according to the intention of the parties."'"'" (*Armendariz, supra*, 24 Cal.4th at p. 122.) The arbitration agreement in *Armendariz* included an unlawful damages limitation and an unconscionably unilateral provision requiring the arbitration of only the employee's claims against the employer. (*Id.* at p. 124.) Our Supreme Court concluded: "[s]uch multiple defects indicate a systematic effort to impose arbitration on an employee not simply as an alternative to litigation, but as an inferior forum that works to the employer's advantage. In other words, given the multiple unlawful provisions, the trial court did not abuse its discretion in concluding that the arbitration agreement is permeated by an unlawful purpose. [Citation.]" (*Ibid.*) The court in *Armendariz* also stated that the unconscionable provisions could only be removed from the agreement through reformation and augmentation of the agreement, which was not permitted. (*Id.* at pp. 124-125.) It reasoned this conclusion indicated that the arbitration agreement was permeated by unconscionability. (*Ibid.*) The court invalidated the entire arbitration agreement. (*Ibid.*)

The arbitration agreement in this case contained a high degree of procedural unconscionability. If these provisions had not been challenged in litigation, Murrey would have been at a significant disadvantage during arbitration. There were also multiple substantively unconscionable provisions, some of which would require us to substantially rewrite the agreement to remove the offending provisions, which we cannot do. (*Armendariz, supra,* 24 Cal.4th at pp. 124-125.) When we consider the procedural

35

and substantively unconscionable provisions together, they indicate a concerted effort to impose on an employee a forum with distinct advantages for the employer. As in *Armendariz*, we conclude "the arbitration agreement is permeated by an unlawful purpose." (*Id.* at p. 124.) Accordingly, we vacate the court's order granting the motion to compel arbitration.

## DISPOSITION

Let a peremptory writ of mandate issue directing the respondent court to vacate the order compelling arbitration and enter a new order denying the motion. The stay previously granted by the court is dissolved. Petitioner shall recover her costs on appeal. (Cal. Rules of Court, rule 8.493(a)(1)(A).)


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

36